UNITED STATES, Appellee

v.

MICHAEL F. KUNAK, Private E–1, U. S. Army, Appellant

5 USCMA 346, 17 CMR 346

348

349

No. 3787

Decided December 30, 1954

LT COL James C. Hamilton, U. S. Army, and CAPT William C. Irby, Jr., U. S. Army, for Appellant.

LT COL William R. Ward, U. S. Army, MAJ Irvin M. Kent, U. S. Army, and 1ST LT Roderick V. Brown, U. S. Army, for Appellee.

### Opinion of the Court

GEORGE W. LATIMER, Judge:

#### I

This unfortunate tragedy is before us on mandatory review pursuant to the provisions of Article 67 (b) (1), Uniform Code of Military Justice, 50 USC § 654. The accused has been convicted of the premeditated murder of Second Lieutenant Harold Bern Williamson and has been sentenced to die. Intermediate appellate agencies have approved the finding and sentence and we are required to review.

The accused defended solely upon the grounds of insanity. Hence, the facts and circumstances of the killing are without dispute. Substantially, they show that on March 31, 1952, he was a member of the 82d Airborne Signal Company, 82d Airborne Division, which was on maneuvers near Adamsville, Texas. Shortly after twelve o'clock noon on that date, Lieutenant Williamson was in the division mess tent seated at a lunch table with Captain Fleming and two civilians. During the conversation at lunch, Captain Fleming, who was seated on the right side of Lieu-

tenant Williamson, looked up and over toward the left and observed the accused coming down a hill carrying a carbine. The accused approached the table where the officers and civilians were seated, executed a right face, lifted the carbine so that the muzzle was approximately four or five inches from the chest of Lieutenant Williamson and fired it. The lieutenant fell to the ground mortally wounded. He died approximately five minutes later. After the shooting, the accused dropped the carbine to the ground and stood at parade rest. That evening an autopsy was performed upon the deceased and it was definitely established that his death had been caused by the missile which had entered his chest. The missile and the case were recovered and upon examination it was determined that a blank cartridge had been converted into a round of live ammunition by fitting a short piece of brass rod into the case. Ballistics experts testified that the cartridge case found at the scene of the shooting had been fired from accused's carbine. A subsequent search of accused's personal effects uncovered another round of improvised

**351**

ammunition which had been prepared for use in the same manner as the one which caused the fatality. Some two days prior to the shooting the accused had asked another soldier where he could get live ammunition. The soldier replied that he did not know and the accused replied that he would make some. He thereupon explained his method of fixing brass rods into blank cartridge cases.

Other evidence, which is not without dispute in some particulars, was introduced for the purpose of establishing the mental condition of the accused. The Government sought to carry its burden of showing the accused was sane and attempted to establish that his actions were motivated by a desire to terminate his service with the Army. The defense, on the other hand, endeavored to establish that they were compelled by an irresistible impulse for which the accused should not be held legally accountable.

The Government's evidence established that two or three days prior to the shooting accused had stated that he was going to kill either Lieutenants Ford, Scherer, or Voeleker; that at about the same time he told a member of his unit that Major Hill, the division neuropsychiatrist, had told him he was going to ship him out of the division; that he remarked that unless they did that, he was going to kill someone; that he had been despondent since Christmas time and had consulted with two chaplains; that he had often stated he wanted to be discharged from the Army and in an effort to succeed in his desire he had once stolen his company commander's boots; that no charges had been brought against him for this act; that he once stated he had an impulse to shoot the officer of the day and if Major Hill did not get him discharged he would shoot an officer and would blame the act upon the Major's failure to act as he requested; that a signal officer had talked with him on March 10 or 11, 1952, and in that conversation the accused had stated he wanted to get out of the Army and had even thought of "punching General Cleland in the nose so that he might be sent to the guard-

house and receive a dishonorable discharge."

The Government to strengthen its case on the accused's sanity called Captain Martin Schumacher, a qualified psychiatrist. He testified he had examined the accused on April 2 and again on April 4, 1952, and that he found him free from mental defect, disease, or derangement; that he was mentally capable, concerning the particular act, to distinguish right from wrong, and that he could adhere to the right and keep from doing wrong. The Captain further stated that in reaching his conclusion he had considered accused's medical history and assumed as true the reports that one of accused's brothers had been in a mental institution for ten years; that the accused, when a civilian, had jumped from a 75-foot bridge; and that accused had attempted to balance himself on his head while riding a motorcycle at a high rate of speed.

On accused's side of the ledger, we have the following evidence. He testified that he recalled the incident of March 31, 1952, and there had never been any difficulties or trouble between himself and the victim; that he had attended high school in Baltimore, Maryland; that his grades were average; that he had quit school a few months prior to graduation because he was bothered and worried; that he had four older brothers, one of whom was in a mental institution; that he had entered the Army in February 1951, and after going to Texas on maneuvers in February 1952, he had become depressed; that he began thinking of killing someone at that time; that because he felt he was going to do something violent, he consulted Major Hill, the Division Psychiatrist, but he did not receive any comfort from him; that he later visited Major Hill again and told him he had stolen his company commander's boots and that he had thought of slapping General Cleland; that Major Hill told him he was sane and sound; that he then went to Father Gigliello, a Chaplain, and told him he was "thinking very much of committing the Fifth Commandment"; that he made the missile from a blank

352

cartridge; that he did not know just what his purpose was in making it, but he was not thinking "too much" of actually killing anyone; that on the day of the shooting when he loaded his carbine his actions were "more or less mechanical"; that he walked toward the officers' mess thinking that "probably this time next month I will be dead"; that he was hoping someone would stop him; that he knew he was doing wrong, but he could not do anything about it; that after he pulled the trigger he was stunned at first and then he "felt flushed out"; that prior to the shooting he had told various officers and enlisted men of his impulse to kill and they had suggested that he commit suicide; that they sometimes laughed at him and jeeringly called him "killer"; that in addition to his half brother, who was in a mental institution, he had a sister who had suffered a nervous breakdown; that he recalled the incidents of riding on his motorcycle, while he was balancing on his head and of jumping off a 75-foot bridge; that he told the psychiatrist that at the time of the fatal shooting, he would have stopped "if anyone had said something or did something, or stopped me."

Chaplain Gigliello corroborated accused's testimony as to their conversation prior to the shooting, and he concluded from the conversation that the accused was mentally confused. In addition, evidence was produced to the effect that one brother was confined in a mental institution; that a sister had been confined in a mental institution; that another brother was, at the time of trial, under the care of a psychiatrist. In addition, two lay witnesses testified for accused by depositions. They were, respectively, the County Attorney and the District Attorney of Lampasas, Texas. The former stated that he had seen the accused on the evening after the shooting and it was his opinion the accused was emotionally upset and mentally unstable. The latter testified that he believed the accused to be suffering from mental instability to such an extent that he was not responsible for his acts.

In rebuttal the Government recalled Major Hill, the psychiatrist who had examined the accused both prior to and after the offense. He stated that he believed the accused, although emotionally unstable, possessed sufficient mental capacity to be responsible for his acts. In addition, Major Baker, the Chief of Psychiatry at Fort Bragg Hospital, was president of a medical board convened to examine the accused. The examination was over a period from April 28 to June 4, 1952. He testified as to the results of his examination and corroborated the testimony of Major Hill. He further testified that accused's mental condition would not affect his capacity to premeditate. Additional details from his testimony will be related under subsequent discussions.

The inquiries on sanity did not end at the court-martial as the issue was further developed at appellate levels. When the case was being considered by the board of review, the members noted that at the trial all the testimony of the expert witnesses was to the effect that the accused was sane. Against this testimony they balanced the evidence of accused's behavior, the presence of mental illness in his family, and his actions prior to and immediately after the shooting. Pursuant to their rules, they concluded to further pursue the question of insanity and accordingly they referred the case to the Surgeon General of the Army. That office was furnished a copy of the record of trial, the allied papers, and the report of a board of officers headed by Major Baker. Based on the information furnished, the office of the Surgeon General forwarded an opinion to the board of review in which it was stated that the accused was sane at the time of the offense and that he had sufficient capacity to understand the nature of the charges against him and intelligently to conduct or cooperate in his defense.

Subsequently, the board received a report from the United States Disciplinary Barracks, Fort Leavenworth, Kansas, that the accused had suffered two violent outbreaks while confined there. A psychologist and psychiatrist from the barracks informed the board that, in their opinion, there was a reasonable doubt as to accused's present

ability to adhere to the right, and they recommended further examination. The accused was thereafter examined by a board of medical officers at Fitzsimmons Army Hospital in Denver, Colorado. The findings of the board were to the effect that while the accused was suffering from emotional instability, he was sane at the time the offense was committed, at the time of trial, and at the time he was examined.

After the original decision by the board of review on April 27, 1953, which affirmed the conviction and sentence, and while the case was pending before this Court, the parties entered into a stipulation by which it was agreed that further action in the proceedings be suspended in order that a civilian psychiatrist might make an examination of accused's mental condition. Thereafter, on October 12, 1953, Dr. Manfred S. Guttmacher, Chief Medical Officer of the Medical Service of the Supreme Bench of Baltimore, was called into the case. He thoroughly reviewed accused's past history, environment, and behavior, and reported his findings at length. He concluded as follows:

"In this Examiner's opinion this patient is a paranoid schizophrenic. It is his definite opinion that this patient was not a legally responsible agent at the time of his offense and that he is insane now. It is his belief that the patient was suffering from a psychotic irresistible impulse at the time of the crime and that he did not have a full appreciation of the wrongfulness of his acts.

"In reviewing this whole situation longitudinally, it seems difficult to understand how a psychiatrist could come to any other conclusion in this case. He does not impress the Examiner as one of those borderline psychotics, but rather as a flagrant one."

In addition to the report of the examination by Dr. Guttmacher, the accused furnished an affidavit signed by Loyal B. Calkins, a criminal psychologist for the Maryland State Penitentiary. At the time Mr. Calkins examined the accused, which was sometime

prior to November 7, 1952, he was a Captain in the Medical Service Corps of the U. S. Army, and the examination was conducted at the Branch, United States Disciplinary Barracks, New Cumberland, Pennsylvania. He stated that he gave the accused a psychological examination and that the accused had been given a Rorschach (ink blot) psychodiagnostic test; that the results of this test indicated paranoid schizophrenia; that the accused was referred to the chief psychiatrist who, because of the serious nature of the offense, referred him to the consulting psychiatrist, Dr. Eaton; and that Dr. Eaton conducted another examination of the accused and agreed with the diagnosis of paranoid schizophrenia.

After the Guttmacher report and the Calkins affidavit had been received, a motion was filed with this Court to dismiss the action on the grounds of insanity. That motion was denied. We, however, returned the record of trial to The Judge Advocate General of the Army for reference to a board of review for a redetermination of the issue of sanity.

Pursuant to the directive from this Court, the board of review considered all of the evidence in the record, weighed the conflicting opinions of the experts, re-evaluated the testimony, and for a second time concluded the evidence established the accused was mentally responsible for the act, and reaffirmed the findings and sentence. The case then reached us for the second time. In the light of this record we must, in all fairness, state that the Army has cooperated in every way to assist the accused in preparing and presenting his defense.

II

Before disposing of the assignment of errors presented to us by the accused, we believe it advisable to mention our views about a recent development on the law of insanity. This is prompted by the holding in Durham v. United States, 214 F2d 862, in which the United States Court of Appeals for the District of Columbia Circuit, discarded the "right and wrong" and the "irre-

sistible impulse" tests on the ground that advancements in psychiatric science have rendered them inadequate. In a painstaking and carefully written opinion, which traced the history of the law of insanity and the development of psychiatry, fully documented by references to cases and textbooks, that Court announced the principles it would follow in the future. The holding which is to control the trial of cases in the Federal judiciary in the District of Columbia can best be explained by quoting a proposed instruction suggested by the Court. It and a prefatory statement are set forth verbatim:

"Whenever there is 'some evidence' that the accused suffered from a diseased or defective mental condition at the time the unlawful act was committed, the trial court must provide the jury with guides for determining whether the accused can be held criminally responsible. We do not, and indeed could not, formulate an instruction which would be either appropriate or binding in all cases. But under the rule now announced, any instruction should in some way convey to the jury the sense and substance of the following: If you the jury believe beyond a reasonable doubt that the accused was not suffering from a diseased or defective mental condition at the time he committed the criminal act charged, you may find him guilty. If you believe he was suffering from a diseased or defective mental condition when he committed the act, but believe beyond a reasonable doubt that the act was not the product of such mental abnormality, you may find him guilty. Unless you believe beyond a reasonable doubt either that he was not suffering from a disease or defective mental condition, or that the act was not the product of such abnormality, you must find the accused not guilty by reason of insanity. Thus your task would not be completed upon finding, if you did find, that the accused suffered from a mental disease or defect. He would still be responsible for his unlawful act if there was no causal connection between such mental abnormality and the act. These questions must be determined by you from the facts which you find to be fairly deducible from the testimony and the evidence in this case."

The Durham case was decided after arguments in the instant case and the theory announced in the instruction was not argued by counsel. It was, however, called to our attention by supplemental authorities filed in the case. We have considered the theory because we deem it inadvisable to decide a capital case without giving thoughtful consideration to the principles adopted by other appellate courts. We have every desire to have the law in the military-judicial system progress with the same degree of liberality as does the civilian law. However, there are problems peculiar to the Armed Forces which make it impracticable for us to follow all of the precedents announced by our brother judges. We believe in this instance we are confronted with one of those situations. We can say that, out of an abundance of caution, law officers might do well, in relevant instances, to enlarge the scope of their instructions on insanity and follow generally the instruction herein quoted. However, our particular problem is to interpret military law in accordance with the intent of Congress and in light of the exigencies confronting the Armed Services.

Without going into the military necessities which might influence us in not adopting the new test in the Durham case, we are confronted with a Manual provision which compels a different approach to the problem. We are required to follow the provisions of the Manual for Courts-Martial, United States, 1951, unless they cover fields outside the authority of the President, offend against the Code, or are contrary to well-recognized principles of law applied in the Federal courts. Of course, a court has the inherent power to determine whether an accused is mentally competent to stand trial. Particularly is this true if Congress has not legislated on the subject. However, in the military the President has, over the years, promulgated the principles governing, and the manner of proceeding with, the defense of insanity. We need

not decide whether the delegation of power to him by Congress, or its long acquiescence in his assumption of authority to legislate on the subject of insanity, sustain the present provisions. We need only say that, under present circumstances, we are not disposed to disagree with the tests he prescribes. In a number of recent cases we have placed our stamp of approval on them and we are satisfied they offer a good working formula for courts-martial. If an accused has the mental ability to know an act is wrong and can refrain from committing it, good arguments can be advanced as to why he should be punished. However, if, in the future, conditions in the Armed Services justify a change in our philosophy, or if Congress sees fit to prescribe a different test for determining insanity, then we will modify our views. But at the present time we prefer to follow the military law as it is expounded in our "Bible."

The military-judicial system has not been niggardly in providing for the defense of insanity. The issue can be raised before, during, or after trial, and on all appellate levels. The facts can be weighed at least three times by separate agencies, and it becomes an issue almost on suggestion. Chapter XXIV of the Manual for Courts-Martial, supra, covers the subject thoroughly. As will be gleaned from its reading, it expresses the law as it has been developed historically in both military and civilian circles. At the time of the Manual's promulgation, the tests prescribed for insanity were those long used by both civilian and military courts, and while they are based on the "right and wrong" and "irresistible impulse" touchstones, they have not become imperfect overnight. Many state jurisdictions have not adopted the irresistible impulse theory, let alone the latest principle. And Federal Courts of Appeal for other Districts have not, as yet, accepted or rejected the rationale of Durham. It must be realized that the holding in that case was to make the change prospectively. Assuming, arguendo, that we could change the law by that method, we have no way of knowing the administrative chaos we might

356

heap upon the services. A legislative body can, by legislation, overturn existing law and at the same time erect safeguards to protect other critical areas, but it is difficult for a criminal court to do so. If, therefore, revolutionary changes are desirable in recasting the law on insanity, we believe the better procedure is to have Congress enact the necessary legislation. In that way the system will not be dislocated.

### III

The accused has assigned seven errors for consideration by this Court. In view of the fact that the death penalty was imposed, and has been affirmed, we shall review each of the specific assignments. Because of the posture of the evidence, the court-martial, counsel, intermediate reviewers, and this Court have encountered no difficulty in disposing of all issues except whether, or to what extent, the accused should be held criminally responsible for his acts.

The board of review in its original opinion stated that the accused "is unquestionably suffering from some mental aberration which not only existed at the time of the offense but also persists until the present time." In the light of that statement, appellate defense counsel, as their first assignment of error, challenge the board of review's affirmance of a conviction of premeditated murder. They contend that the aberration suffered by the accused resulted in an inability to premeditate and form a specific intent to kill. Of course, that does not follow. There is evidence to the contrary, and the board of review found otherwise. We suppose the board of review used the word aberration in its generally accepted meaning and that it intended to, and did, hold the accused was suffering from some disorder which did not reach insanity and which did not impair his mental capacity to premeditate. Certainly had the board of review concluded otherwise, it would not have found the element of premeditation present.

### IV

The defense next contends the board

of review abused its discretion in not finding in accordance with the conclusions of Dr. Guttmacher and Mr. Calkins. We overrule that contention. The written decision on reconsideration by the board of review relates that the evidence procured from Dr. Guttmacher and Mr. Calkins was considered in its redetermination of the issue of sanity. The board of review rightly considered the entire record and, in doing so, weighed the testimony of all psychiatrists who had examined the accused and all lay witnesses who testified on his mental condition. While the evidence last obtained was contrary to other expert testimony in the record, we cannot say that the board of review was compelled to accept it as a matter of law. It is to be noted that the additional evidence was contradicted by reports of medical examiners made at about the same time and while the case was pending before the board of review. The latest acquired evidence merely created a disputed question of fact which, under the provisions of the Code, the board was permitted to resolve. Its decision is not subject to reversal if there is substantial evidence to support it.

In this connection the language of Justice Arnold of the United States Court of Appeals for the District of Columbia in the case of Holloway v. United States, 148 F2d 665, cert den, 334 US 852, 92 L ed 1774, 68 S Ct 1507, is apropos. In that case he stated:

"And so it is that when psychiatrists attempt on the witness stand to reconcile the therapeutic standards of their own art with the moral judgment of the criminal law they become confused. Thus it is common to find groups of distinguished scientists of the mind testifying on both sides and in all directions with positiveness and conviction. This is not because they are unreliable or because those who testify on one side are more skillful or learned than those who testify on the other. It is rather because to the psychiatrist mental cases are a series of imperceptible gradations from the mild psychopath to the extreme psychotic, whereas criminal law allows for no gradations. It requires a final decisive moral judgment of the culpability of the accused."

We have considered the assertion that the report of Dr. Guttmacher and the affidavit of Mr. Calkins were not before the original triers of fact. However, boards of review are authorized by the Code to weigh the evidence and redetermine questions of fact. Article 66 (c), Uniform Code of Military Justice, 50 USC § 653. In insanity proceedings, they can obtain additional evidence and the testimony so obtained is subject to being accepted or rejected by those boards. They may give any evidence such weight as they believe it warrants in the light of the entire record. In the instant case that was done and we cannot say, as a matter of law, that the board of review erred in its analysis of the testimony. It follows that no abuse of discretion was shown.

V

As their third assignment of error, appellate defense counsel contend that the testimony of prosecution's witness, Major Baker, was the result of the coercive influence of the language of TM 8–240, AFM 160–42, dated September 1950, and entitled "Psychiatry in Military Law." That Manual was promulgated by order of the Secretary of the Army, in conjunction with the Secretary of the Air Force, and its purpose is to amplify the Manual for Courts-Martial provisions governing insanity and to promulgate general principles of psychiatry as applied in military law.

The particular language which is assailed as coercive is found in Section 5, at page 5. There it provides:

". . . Before testifying that an accused did the act because of an irresistible compulsion, the medical officer should be satisfied first, that the act is part of a repeated psychoneurotic pattern; second, that the patient exhibited mounting anxiety or tension which was relieved by the theft, arson (or whatever the compulsion

357

was); and third, that the compulsion generated by the illness was so strong that the act would have been committed even though a policeman had been at the accused's side at the time the opportunity to commit the offense presented itself."

The section, which is quoted only in part, sets forth a definition of the doctrine of irresistible impulse as applied in military law, and in this it is in accord with the general rule prevailing in those jurisdictions which recognize the doctrine. See United States v. Trede, 2 USCMA 581, 10 CMR 79; Smith v. United States, 36 F2d 548 (CA DC Cir); 70 ALR 654, and cases collected in Annotation, 70 ALR 659.

Major Baker's testimony, which is criticized, was given in answer to a question propounded by a member of the court as to whether an act resulting from an irresistible impulse could be premeditated or planned in advance, or whether it could come from an impulse to strike just before the act. He mentioned the three qualifications set forth above and then explained in detail why he believed the accused's medical history and behavior pattern failed to establish an uncontrollable impulse. He concluded the accused was impelled by a desire to bargain for a discharge. There is no showing that the three requirements are not appropriate elements to substantiate a conclusion of irresistible impulse and the Major's approach does not bear out the assertion that his conclusion was dictated by a "disciplined adherence" to the technical manual. On the contrary, a reading of his testimony is convincing that he arrived at his conclusions from an independent evaluation of many factors taken from independent sources. Moreover, he did not indicate that his judgment was in any way controlled by the text. For aught that appears, he was in entire agreement with its provisions and he used the Manual in the same manner as any expert would use a recognized work on psychiatry. Under those facts and circumstances, we are required to overrule the assignment of error.

**358**

VI

Appellate defense counsel next contend that the law officer committed prejudicial error in authorizing the court-martial to take judicial notice of Technical Manual 8–240, supra. We disagree. As previously stated, the Manual was issued by the Secretary of the Army for the purpose of defining and explaining legal standards for determining the sanity of an accused. The language of paragraph 5, with which we are here concerned, accords with that contained in the Manual for Courts-Martial, supra, and is in no way contrary to the provisions of the Code. It has long been established that authorized regulations of the Departments of the Federal Government have the force and effect of law. See United States v. Eliason, 16 Pet 291, 10 L ed 968; Gratiot v. United States, 4 How 80, 11 L ed 884; and Standard Oil Co. of California v. Johnson, 316 US 481, 86 L ed 1611, 62 S Ct 1168. It is also well established that authorized Federal departmental regulations are matters which might be judicially noticed. Sprinkle v. United States, 141 Fed 811, 820 (CA 4th Cir); and United States v. Fried, 149 F2d 1011 (CA 2d Cir), cert den 326 US 756, 90 L ed 454, 66 S Ct 97. This general rule has been adopted by the military. Paragraph 147a, Manual for Courts-Martial, supra, sets out matters which might properly be the subject of judicial notice. Among them are the following:

"The organization of the Department of Defense, of the departments, agencies, bureaus, branches, forces, commands, and units thereunder, and of the Coast Guard and its subordinate commands and units; and, *with respect to any of the foregoing*, their location, their seals, inked stamps, or other identification marks, and *the regulations and official publications pertaining thereto or issued thereby*, including general orders, bulletins, circulars, price lists, and court-martial orders." [Italics supplied.]

Counsel do not call our attention to anything in the technical manual which is at variance with well-accepted views

on mental diseases. Moreover, defending counsel, trial counsel, and witnesses discussed its provisions; and all material information contained therein can be found in the testimony of witnesses. If the oral testimony was not prejudicial, and we so hold, the written contents of the manual could not be prejudicial. This assignment of error is, therefore, overruled.

## VII

The fifth assignment of error attacks the instructions given by the law officer. Specifically, it is contended that he erred in telling the court members that accused could not be said to have acted under an irresistible impulse if they believed he would not have committed the act had a policeman been present. The questioned instruction is as follows:

"Even though the accused may have been able to distinguish right from wrong as to the act charged, he is, nevertheless, not mentally responsible if, because of some mental defect, disease, or derangement, he was unable to adhere to the right as to the act charged. An inability to adhere to the right does not exist unless the act is committed under an irresistible impulse which completely deprives the person of the power of choice or volition. If the accused would not have committed the act had there been a military or civilian policeman present, he cannot be said to have acted under an irresistible impulse. A mere defect of character, will power, or behavior, as manifested by ungovernable passion or otherwise, does not necessarily indicate a lack of mental responsibility, even though it may demonstrate a diminution or impairment of the ability to adhere to the right as to the act charged."

The "policeman at the elbow" test, as given to the court-martial, merely states one standard by which accused's claim of irresistibility can be measured. It must be remembered that this test is applied only in those instances where, as here, it is clearly shown that the accused possessed sufficient mental ability to recognize the wrongful nature of his act. The principal issue, then, was to determine the extent of his mental capacity to adhere to the right. The origin and purpose of the "policeman" test were set forth in People v. Hubert, 119 Cal 216, 51 Pac 329, as follows:

"... But when the will power is weakened, although the mentality is not at all or slightly impaired, the fear of punishment must be of some value as a restraint, and the class of people referred to need that restraining influence most. Lord Bromwell, in a discussion of this subject, related the case in which a witness, to prove that a prisoner was so afflicted, related that he had once become violent and killed a cat, and said he believed the impulse could not be resisted by the defendant. His lordship asked if he thought he would have killed the cat if a policeman had been present. The witness answered, 'No.' His lordship then said he supposed the impulse was irresistible only in the absence of a policeman."

We understand the term "irresistible impulse" as used in criminal law to mean an impulse to commit an act which is so compelling that it cannot be resisted by the accused. All the instruction seeks to point out is that if a person would be deterred from committing the act by the presence of an arresting officer, he has the mental capacity to adhere to the right and resist its commission. We believe the test is one means by which the law officer can suggest to the court-martial members how the irresistibility of an impulse can be determined. There are other methods which could be suggested and, while the one used is merely a rule of thumb, it has been recognized as an acceptable test. In this instance there was a dispute as to whether the crime was deliberately planned or involuntarily compelled. Had it been the former, the presence of an arresting officer would, in all probability, have prevented its execution. Had it been the latter, the presence of a squad of policemen would have made little difference. As a matter of fact, in this case the instruction

may have been beneficial to the accused as officers with the power to arrest were present when the crime was committed. From this it could be argued with merit that the act was committed under an impulse so great that the presence of two officers and two civilians failed to deter the accused from killing.

We are not impressed with the argument that the change in the technical manual, made subsequent ■ to the trial, is a concession that the "policeman at the elbow" concept was legally incorrect. The new technical manual, promulgated in May 1953, deleted the reference to the "policeman" test, and substituted therefor the following:

"If the medical officer is satisfied that the accused would *not* have committed the act had the circumstances been such that immediate detection and apprehension was certain, he will not testify that the act occurred as the result of an 'irresistible impulse.' No impulse that can be resisted in the presence of a high risk of detection or apprehension is really very 'irresistible.'"

We see no substantial difference between the concept of a "policeman at the elbow" and that of the "presence of a high risk of detection and apprehension." Both tests are based upon the theory that if fear from immediate detection and certain apprehension is sufficient to deter an accused from committing the crime he has the mental capacity to adhere to the right. While a uniform and a badge may be a little more impressive and visible, if that alone would cause the accused to overcome the impulse, then his mind would not be so befuddled that he would be driven on to commit the offense regardless of consequences. For the foregoing reasons, we find accused's fifth assignment of error without merit.

## VIII

Another contention advanced by the accused is based upon alleged errors committed by the law of- ■ ficer and the members of the court-martial after it had closed to deliberate on the findings.

**360**

The law officer was called into the closed session of the court, and the record reflects the following:

"PRES: We have reached a finding and it has been written here by striking out the words in the book, and writing in the name of the accused. A question has been raised as to whether two-thirds or all is required on the finding, as opposed to the sentence?

"LO: It is two-thirds on the finding.

"PRES: This is not necessary except where it is a mandatory death sentence, is that correct?

"LO: That is right, Colonel."

Appellate defense counsel contend that the above quoted statements of the law officer constituted participation in the deliberations of the court. We believe to the contrary. Article 26(b), Uniform Code of Military Justice, 50 USC § 590, prohibits consultation of the law officer with the members of the court out of the presence of accused and counsel except for certain purposes. That Article is as follows:

"The law officer shall not consult with the members of the court, other than on the form of the findings as provided in article 39, except in the presence of the accused, trial counsel, and defense counsel, nor shall he vote with the members of the court."

Article 39 of the Code, 50 USC § 614, provides:

"Whenever a general or special court-martial is to deliberate or vote, only the members of the court shall be present. After a general court-martial has finally voted on the findings, the court may request the law officer and the reporter to appear before the court to put the findings in proper form, and such proceedings shall be on the record. All other proceedings, including any other consultation of the court with counsel or the law officer shall be made a part of the record and be in the presence of the accused, the defense counsel, the trial counsel, and in general court-martial cases, the law officer."

Here it is apparent, from the state-

ment made by the president of the court-martial, that at the time the law officer entered the closed session the deliberations of the court had concluded and the finding had been reached. The form in the Manual contains a multiple choice of two-thirds of all of the members concurring in the findings. However, some question had been raised as to which vote should be recorded. It is certain that at least the minimum number of votes to convict had been cast and apparently the court-martial members had concluded that a unanimous vote was necessary only when a death sentence was mandatory. The law officer verified that only two-thirds of the members need concur and the findings were rendered in that form. The Code does not specifically prohibit the law officer from supplying this information in closed session and there are two provisions of the Manual which appear to authorize communications between the law officer and court-martial as to the vote. Paragraph 74*f*(1), Manual for Courts-Martial, supra, provides:

"After a general court-martial has finally voted on the findings, it may request the law officer and the reporter to appear before it to put the findings in proper form, and such proceedings shall be made a part of the record. See Article 39. The president shall speak for the court in discussing the findings with the law officer and he shall be careful not to disclose the vote of any particular member of the court; *he may, however, indicate whether a finding was concurred in by two-thirds or all of the members, as the case may be.* See Article 52*a* in this connection." [Italics supplied.]

Paragraph 74*g* of the Manual states:

"As soon as a court-martial has determined the findings in a case, it will announce them in open court in the presence of the law officer, counsel, and the accused. *Only the required percentage of members who concurred in findings of guilty should be announced.*" [Italics supplied.]

Since the president of the court-martial is required to announce the findings, and state therein only the percentage of the members who concurred in the finding of guilty, it is reasonable to assume that the advice sought in the instant case pertained only to the form in which the findings should be announced. We believe this sort of activity on the part of the law officer falls short of the consultation and participation in the deliberations of the court proscribed by Articles 26(*b*) and 39 of the Code, supra. Where, as here, the court-martial had completed its deliberations and reached a finding, and the advice given by the law officer was correct and necessary to announce properly the findings, we are of the opinion that no error occurs. See United States v. Miskinis, 2 USCMA 273, 8 CMR 73.

## IX

Defense counsel lastly contend that the report of the closed conference, previously quoted, shows that the law officer allowed members of the court-martial to take a copy of the Manual for Courts-Martial into the closed session when the court was deliberating on the findings. This, they argue, was prejudicial error. We have previously suggested that it is permissible for the court-martial members to refer to the Manual. In United States v. Gilbertson, 1 USCMA 465, 4 CMR 57, we stated:

"We have no disposition to criticize referral to the Manual for pertinent amplifying material after full instruction on the elements has been given. This may well be helpful to the court."

A reference to the Manual would be of no help to the court-martial if the members were denied access to it. Aside from that, here, at most, the court-martial members used the Manual for the purpose of determining the form for the findings. We find no error in that act.

## X

This brings us to an error which we conclude is fatal to the findings and sentence on premeditated murder. It involves the question of whether the law officer erred in failing to instruct the court-martial members that they

**361**

might consider the mental deficiency of accused—short of insanity in the legal sense—in determining his capacity to premeditate. We have on several occasions mentioned the necessity of covering that issue by an appropriate instruction if it is raised reasonably by the evidence. One can hardly contend in this case that there was no substantial evidence of mental deficiency which might interfere with those mental processes. The instruction on premeditation is sketchy and while the one defining insanity informed the members of the court-martial that they could not convict the accused of the crime charged if there was a reasonable doubt about his mental responsibility, it is deficient, for the purpose under consideration, in that it was tied up to legal insanity which would exculpate the accused of the offense charged and all included offenses. The law officer nowhere suggested the important principle that mental impairment, less than legal insanity, might be considered by the court-martial members when they were deliberating upon the element of premeditation. Significantly, missing in this case is an instruction to the effect that if in the light of all evidence the court-martial has a reasonable doubt that the accused was mentally capable of entertaining the premeditated design to kill involved in the offense of premeditated murder it could find the accused not guilty of that degree of the crime.

We recognize that State authorities can be found which do not support our views on this question. However, we believe the Supreme Court in Hopt v. People, 104 US 631, 26 L ed 873, which has not been overruled, fortifies our position. In that case the Supreme Court held it was error to refuse an instruction that intoxication might be considered as affecting premeditation in a murder trial. That Court did not limit its holding to mental deficiencies caused only by intoxication. It went further in its discussion and dealt with the other mental disorders. In that opinion we find the following language:

"... When a statute establishing different degrees of murder requires deliberate premeditation in order to constitute murder in the first degree, the question, whether the accused is in such a condition of mind, by reason of drunkenness *or otherwise*, as to be capable of deliberate premeditation, necessarily becomes a material subject of consideration by the jury." [Italics supplied.]

We have expressed previously our views on Fisher v. United States, 328 US 463, 90 L ed 1382, 66 S Ct 1318, which is relied on by the Government. See United States v. Higgins, 4 USCMA 143, 15 CMR 143, and United States v. Edwards, 4 USCMA 299, 15 CMR 299. A majority of the Supreme Court in that case bottomed their decision on the local law in the District of Columbia and so it did not overturn the rule of the Hopt case. We quote an important paragraph from that opinion:

"No one doubts that there are more possible classifications of mentality than the sane and the insane. White, Insanity and the Criminal Law, 89. Criminologists and psychologists have weighed the advantages and disadvantages of the adoption of the theory of partial responsibility as a basis of the jury's determination of the degree of crime of which a mentally deficient defendant may be guilty. Congress took a forward step in defining the degrees of murder so that only those guilty of deliberate and premeditated malice could be convicted of the first degree. It may be that psychiatry has now reached a position of certainty in its diagnosis and prognosis which will induce Congress to enact the rule of responsibility for crime for which petitioner contends. For this Court to force the District of Columbia to adopt such a requirement for criminal trials would involve a fundamental change in the common law theory of responsibility."

Even assuming we have incorrectly interpreted that decision, we are confronted with a situation different than the one presented to the United States Supreme Court in the Fisher case. We have a controlling directive on intoxication and we have likened the principles controlling instructions on that defense to instructions on the defense

of mental disorders. See United States v. Higgins, supra. In addition, we have in this opinion previously relied on TM 8–240, AFM 160–42, for principles to support the Government's contentions. We should, therefore, look to it for assistance on this issue. Paragraph 9(a), page 7, May 1953 edition, has this to say with regard to this particular problem:

"Some offenses consist of an overt act plus intent, wilfulness, or some other state of mind. An accused may have committed an overt act, yet have had a mental disorder which robbed him of the ability to entertain the intent or state of mind required by the offense charged. For example, the crime of desertion consists of the act of absence without leave, plus the intent not to return (or the intent to shirk hazardous duty). In a given case, an accused charged with desertion might, because of some mental disorder, be incapable of forming any very clear intent. In such a case, the psychiatric testimony might lead the court to strike out the 'intent' element of the charges, thus reducing the offense to absence without leave. Other crimes, murder punishable by death, for instance, may require an element of premeditation. Here, too, the accused by reason of some mental disorder, might be incapable of the required premeditation, though capable of having intent to kill or inflict great bodily harm (par. 197, MCM, 1951). Thus, the medical officer does not discharge his full duty when he reports on the sanity of the accused in general. He must be prepared to say whether the defendant's mental state was such that he was capable of having the degree of intent, wilfulness, malice, or premeditation which the law requires for determination of guilt or for a certain degree of guilt."

The foregoing paragraph becomes more important when considered in connection with the answers required by paragraphs 3a(3)(b) and 18a(7). They are set forth respectively:

"Did the defect, disease, or derangement, although not rendering him completely incapable of adhering to the right with respect to the act charged, tend to impair or diminish his ability so to do?" [Paragraph 3a(3)(b).]

"Was the accused capable of forming the degree of intent, wilfulness, malice, or premeditation called for by the nature of the offense charged? (See par. 9.)" [Paragraph 18a(7).]

While a paragraph in the technical manual following paragraph 3a(3)(b) shows that the answer to the question is not material to a determination of whether the accused is to be considered mentally responsible, the authors of that manual must have considered the two questions as having some bearing on the law of psychiatry. We gather from the three quoted provisions that they intended to distinguish between the nature and extent of a mental disorder which will affect a person's capacity to form a general intent to commit a crime and a confused mind which will affect his capacity to premeditate. We have previously acknowledged the difference. In United States v. Holman, 3 USCMA 396, 12 CMR 152, we made the following observations:

"We have considered accused's other assignments, and have concluded that they are without merit. The evidence was wholly insufficient to have required an instruction regarding intoxication and its legal effect. With respect to the evidence of sanity, it is clear that it, too, fell far short of showing legal insanity, as was similarly the case in United States v. Trede, 2 USCMA 581, 10 CMR 79, decided May 29, 1953. Our opinion in Trede provides a sufficient response, and a distinctly negative one, to the assertion of appellate defense counsel that—although the evidence did not tend to establish legal insanity—the law officer was required to instruct the court-martial that its members should consider the disturbed state of the accused's mind, in relation to his ability to entertain a specific intent, to the same extent and on the same theory that instructions might have been demanded had

there been abundant evidence of intoxication."

It has been called to our attention that this decision has been construed as holding that an instruction on the effect mental deficiencies, not amounting to legal insanity, may have on accused's ability to premeditate is not required. We do not so interpret the opinion. In that case, we found the evidence wholly insufficient to have required any instruction on intoxication or insanity and their legal effect. The rule in that case is not applicable here for the reason that insufficiency of the evidence to raise an issue is not involved.

If we failed to speak clearly in that case, we were more specific in United States v. Higgins, supra. In that case, Judge Brosman, speaking for a unanimous Court, made the following pertinent comments:

"In Fisher v. United States, supra, the majority distinguished the prior pronouncement in Hopt by pointing out that it stemmed from a specific statute. Since that statute is closely approximated by the directive provisions of the Manual for Courts-Martial, United States, 1951, paragraph 154a(2), no such distinction is available to us. Moreover, if an accused person may lessen his criminal responsibility by a showing that he was not able to entertain premeditation, intent, or knowledge due to voluntary intoxication — a condition largely within his own control, and disapproved by society and the law— we would regard as anomalous a refusal to permit a showing that premeditation, intent, or knowledge was or might be wanting due to some mental derangement—usually without the accused's control. It would seem to follow that if an accused person produces evidence of an underlying mental state, which might have served to affect his intent at the time of the acts alleged, then the law officer should advise the court that its members may properly consider the evidence of mental condition in determining the accused's capacity to entertain premeditation, intent, or knowledge—when any of these is rel-
evant to an offense charged. However, a showing of amnesia *without more* would not necessitate such an instruction."

Some thirty days later we again dealt with the problem in United States v. Edwards, supra. The following comments may be found in that opinion:

". . . We have previously stated that a person's mental state, even though he is not insane, may be such that he is unable to premeditate. United States v. Higgins, supra. However, mere loss of moral restraints leading to a surrender to criminal tendencies will not destroy premeditation. We must, therefore, consider the concepts announced in light of the factual background. There are many differences between the facts of this case and those related in Fisher, supra. We are not here dealing with the facts of that case nor a theoretical problem; we are dealing with the accused and the individualized facts of this case. It is in the light of this record that we must determine whether a general mental impairment rendering accused incapable of premeditating was raised, and, whether or not the instructions given by the law officer met minimal standards to require the court-martial to consider that possibility. In this instance, there is no evidence to the effect that accused was suffering from a deranged mental condition which would prevent him from resisting an impulse to kill the victim. The medical evidence which confronts us is that the accused was of average intelligence, he was able to adhere to the right, and that, even though he possessed a psychopathic personality, his condition was not such as to lessen his responsibility for the crime committed. In Fisher, supra, medical evidence established that a deranged mental condition rendered the defendant unable to resist the urge to kill the victim. The defendant's acts and conduct were described as those of a man of primitive emotions reacting to the sudden stimulus of insult and proceeding from that point without purpose or design. His was a very low grade of

mentality and no motive could be found in that record to account for the killing except imputations implicit in the expressions used by the victim. Here the accused had an average mentality, but he possessed an insatiable desire for sex satisfaction, and the killing occurred at the spot where the sexual act occurred. It is a fair inference that a motive for the crime could have arisen out of the sex abnormalities of the accused and his desire to force his attentions on the victim. Aside from that difference, the opinion of all the medical officers who examined the accused was that he could plan to commit an offense, and that he had the mental capacity to know it was wrong and to resist its commission, had he attempted so to do. If their conclusions are accepted, then accused had the capacity to premeditate."

We affirmed the findings and judgment in United States v. Edwards, supra, but we were careful to point out that the law officer instructed the court-martial, in substance, that if in the light of all evidence the court-martial members had a reasonable doubt that the accused was mentally capable of entertaining a premeditated design to kill, he must be found not guilty of the crime of premeditated murder. That instruction is missing in this instance, and when we consider its omission in the light of this record, we believe these instructions fail to meet the minimal requirements for the issue of premeditation. However, they are sufficient for unpremeditated murder, every essential element of that offense was found by the court-martial, and each is supported by ample evidence.

While we reverse the findings and sentence on premeditated murder for instructional deficiency, we ▆▆▆▆▆ need not direct a rehearing. In United States v. Craig, 2 USCMA 650, 10 CMR 148, we laid down the rule that unpremeditated murder in military law did not require a specific intent and in this instance we deal with the failure to instruct on mental disorders, not amounting to legal insanity, in the same manner as we treated the failure to instruct on intoxication in that case. While a mental disorder, something less than insanity, may interfere with the ability to premeditate, it does not exonerate an accused from the commission of a crime involving only a general intent. We, therefore, reverse the findings and sentence and return the record of trial to The Judge Advocate General of the Army for reference to a board of review for reconsideration. The board may, if it so concludes, affirm a finding of unpremeditated murder and affirm an appropriate sentence as was done in United States v. Bigger, 2 USCMA 297, 8 CMR 97, or it may reverse and return the cause for rehearing.

BROSMAN, Judge (concurring):

On all of the important points in this case, I concur fully with Judge Latimer, and our few fields of disagreement, I believe, are collateral and fall within the category of dicta. However, there are probably sufficient differences in emphasis to justify the filing of this separate opinion.

## II

With respect to the evidence which has been urged as demanding that a new trial be granted on the ▆▆▆▆ ▆ point of mental responsibility, I must mention several considerations. The accused was interviewed by one psychiatrist, a Major Hill, three times prior to the offense and thereafter as well. The Major concluded that Kunak was legally sane. According to the latter's own testimony, he was seen by three psychiatrists at Fort Hood within a few days of the commission of the offense. One of these, a Captain Schumacher, testified at the trial, and also voiced his conclusion that the accused was sane. Too, a sanity board, convened later at Fort Bragg, made an independent and careful check, including an observation of the accused for thirty days during hospitalization there. These last three psychiatrists—that is, the members of the board—appear also to have concluded that Kunak was sane, and the president expressed this opinion at the trial. In addition, it was brought out

in testimony coming from the president of this board—and also from the accused himself—that a well-known civilian psychiatrist, a Dr. Hohman of Duke University, had participated in the discussions of the group. Yet out of this welter of psychiatric evidence having to do with examinations prior to trial, the testimony of not one medical expert was offered by the defense. The most obvious and compelling inference is that no psychiatrist who saw the accused at the time was of the opinion that he was mentally irresponsible under the law. Moreover, no lay witness stated that the accused was insane—although one expressed doubt concerning his ability to adhere to the right. On the other hand, several lay witnesses testified explicitly that they regarded him as sane.

In view of this solid wall of adverse testimony from experts who examined Kuniak near the time of the offense, and from other witnesses as well, it would be difficult indeed to justify upsetting the findings of guilty by reason of evidence adduced at a later time. That evidence, no matter how emphatic, is distinctly subject to the interpretation that the accused's condition had simply deteriorated after the homicide—perhaps due to the impact of the pressures of the trial and the strain of long term confinement. Moreover, in the present case even the post-hearing data were conflicting—since a second sanity board, convened during the course of review of the case, also considered the accused to be legally sane. Like its predecessor, this board enjoyed the benefit of observation of the subject during another period of hospitalization—and it would seem that its conclusions should in general, be entitled to greater weight than those based on short interviews, no matter how eminent and learned the medical experts expressing the latter may have been.

The Chief Judge has intimated that the very unanimity of the psychiatric testimony at the trial constitutes an indicium that something suspicious occurred. I hardly know what to make of this position. Certainly it is hardly flattering to practitioners of psychiatry —and almost frightening in its legal-administrative implications. While I concede that disagreement among psychiatric witnesses is not unknown—in fact, is a commonplace in many courtrooms—I suspect that the military system, with its provision of sanity boards to observe the accused prior to trial, tends to forestall much of this conflict. Indeed, the military procedure is similar in this respect to that established under the Briggs Law in Massachusetts, where courtroom battles between psychiatrists are seldom observed.[1] The reason appears to be that under these schemes the opportunity furnished psychiatrists to observe the accused under hospital conditions prior to trial, and thereafter to consult calmly with each other, produces more frequently a diagnosis which is satisfactory to all. One would expect to find this tendency even more marked in the military establishment, where greater specification is provided in the standards for the determination of mental responsibility. See United States v. Smith, 5 USCMA 314, 17 CMR 314.

### III

The Chief Judge has commented on the provisions of TM 8–240, which provide three criteria for the ■■■■■ ascertainment of irresistible impulse. As I read the Technical Manual, these requirements

[1] In discussing the impact of the Briggs Law, Dr. Overholser has pointed out that "The battles of experts, which these various types of legislation discussed have been designed to obviate, have become almost unknown in Massachusetts, and in every instance which has come to the author's attention the report of the examiners has been sustained by the jury." Quoted by Weihofen, Mental Disorder as a Criminal Defense, 1954, page 344. See also Report of the British Royal Commission on Capital Punishment, 1949–1953, paragraph 439. In paragraphs 414–441, the Commission appraises various proposals for obtaining reliable psychiatric evaluation of an accused. Incidentally, Mr. Justice Frankfurter's testimony before the Royal Commission included a discussion of pretrial psychiatric examination. Minutes of Evidence, Royal Commission on Capital Punishment, Q 8027–8055.

have to do with an impulse claimed to derive from compulsive psychoneurosis, and are not at all applicable to one attributable to psychosis. The three criteria are: (1) that the act is part of a recognizable psychoneurotic pattern; (2) that mounting anxiety existed, or tension which was relieved by the offense; and (3) that the compulsion was so strong that the act would have been committed although a policeman had been at the accused's side at the time.

The first two criteria reflect the Technical Manual's warning that "The medical officer will be properly skeptical of an allegedly irresistible impulse that was, for the first time in the subject's life, suddenly generated just before the commission of the crime." This caution in turn derives from the dictate of the Manual for Courts-Martial to the effect that only an inability to adhere to the right, which stems from "mental disease, defect or derangement," will exculpate an accused. It ■■■■■ seems generally recognized that there is no mental "disease" of irresistible impulse. See United States v. Smith, supra, footnote 28. Therefore if irresistible impulse is to be utilized as a defense, it must be linked to some psychiatric diagnosis which falls within the purview of "mental disease, defect or derangement." This will reduce to psychosis or psychoneurosis, as I interpret the Manual for Courts-Martial within the framework of the Joint Armed Forces Definitions of Psychiatric Conditions, SR 40–1025–2. See United States v. Smith, supra.

The Technical Manual, "Psychiatry in Military Law," as I see it, seeks only to serve as a bridge between the Manual for Courts-Martial and these Joint Armed Forces Definitions. The criterion of anxiety in testing for an irresistible impulse claimed to derive from compulsive psychoneurosis amounts to no more than a focus on the chief characteristic of psychoneurotic disorders—that is to say, anxiety. See SR 40–1025–2, paragraph 5. The emphasis on a "repeated psychoneurotic pattern" is simply an exhortation to the examiner to be certain that there is a psychoneurosis. As indicated in the same Special Regulations, "Longitudin-

al (lifelong) studies of individuals with such disorders usually present evidence of periodic or constant maladjustment of varying degree." Supra, paragraph 5.

The statement in TM 8–240, paragraph 5, that "It is evident that only very rarely, if indeed ever, do offenses committed within the framework of a supposed compulsive psychoneurosis satisfy all three criteria, particularly the third," simply recites the doubts maintained by many psychiatrists that a really serious offense—say murder—can ever derive from compulsive psychoneurosis. See United States v. Smith, supra, page 334, footnote 27.

The Chief Judge also argues that it is unfair to permit material of this nature to be presented to a ■■■■■ ■ court-martial via judicial notice. In the first place, I find no choice left open to us—since, as Judge Latimer indicates, the Manual for Courts-Martial authorizes this procedure. See also United States v. Smith, supra. Although Judge Quinn insists that a limiting construction must be given the word, "facts," as used in paragraph 147a, I cannot avoid the conclusion that language used in this Government directive falls clearly within the scope of "facts" as used in the Manual.

Secondly—and with special reference to the present case—it is clear that defense counsel was entirely willing that the Technical Manual be judicially noticed by the court. Actually the first mention of TM 8–240, "Psychiatry in Military Law," at the trial came from defense counsel himself, who referred to it in the course of an out-of-court hearing, which forms Appellate Exhibit 2. Subsequently, on recross-examination of Major Hill, a prosecution witness, defense counsel adverted to the three criteria of irresistible impulse set out in the Technical Manual, and presented the substance of each in questions to the witness. The last rebuttal witness, Major Baker, referred to the Technical Manual in response to a question from a court member. In the course of his testimony at this point, the Major indicated a clear misconcep-

tion of the "policeman" test. As Major Baker sought to apply the "policeman at the elbow" test, the accused did not at all qualify, because it was the former's opinion that Kunak would have refrained from the act had there been a prospect that a policeman *would frustrate it prior to commission*. Defense counsel, in previously questioning Major Hill, had brought out that the test laid down in TM 8–240, with respect to the presence of a policeman, was directed to the prospect of *detection and apprehension*—and was not to be used in the manner in which Major Baker later sought to use it. See also United States v. Smith, supra. Accordingly, defense counsel in his further cross-examination of Major Baker adverted specifically to the Technical Manual, and said to Major Baker: "It [TM 8–240] explains the policeman being there by saying that it is a question of *detection*, and *not* being interfered with, is that it? That's on the bottom of page five, and your's is just like this one." (Italics supplied.) Major Baker answered, "That is correct"—whereupon the law officer stated:

"LO: At this time the law officer will instruct the court that they are authorized to take judicial notice of the said Manual—what is that number?
"A: Technical Manual 8–240, dated September 1950.
"LO: The court is authorized to take judicial notice of the said Manual and its contents, and will do so."

Defense counsel offered no objection to having the publication noticed judicially for the plain reason that he was using it at the time to impeach a prosecution witness. Clearly he wished the court-martial to know that TM 8–240, paragraph 5c, page 6, in connection with the "policeman" test, stated· that "No impulse that can be resisted in the presence of a high risk of detection or apprehension is really very 'irresistible' "—for this sentence contradicted Major Baker's interpretation. See United States v. Smith, supra.

In addition to the limited purpose for which the defense counsel wished TM 8–240 to be noticed judicially at that

time, there was an additional purpose to be served—since he felt that Kunak's case fell directly within the pattern of TM 8–240, paragraph 5. This able attorney had offered evidence of what he contended to have been prior irresistible impulses on the accused's part. Through the accused's testimony, counsel had built up a picture of mounting tension, virtual automatism, and relief of anxiety after the homicide. If the "policeman at the elbow" test were correctly construed as meaning absence of fear of detection and apprehension, then the accused would have experienced less difficulty in meeting that criterion—for the reason that the shooting occurred in broad daylight, with military policemen in the vicinity, and with no effort on Kunak's part to escape. In short, the reference to the three criteria of TM 8–240 can scarcely have harmed the accused—as is evidenced by the circumstance that his own counsel made the first mention thereof, and dealt with them at length thereafter.

A further point may be made in this connection—which is that defense counsel showed himself quite unwilling to be bound by a different Army publication when his purpose was not served thereby. This is graphically illustrated by a colloquy with Major Baker during the course of cross-examination. At that time the distinction between character and behavior disorders, on the one hand, and schizophrenia, on the other, was being examined.

"Q. Well, schizophrenia is a character and behavior disorder, is it not?
"A: No, sir.
"Q: Well, that is the way it exemplifies itself outwardly, isn't it?
"A: No, sir. Character and behavior disorder as defined in SR 40–1025–2 is a rather technical entity, and refers—
"Q: Well, what is it?
"A: And it refers to those individuals who exhibit a developmental defect in their personality structure, who have a lifelong history of actions and behavior, rather than the formation of mental and emotional symptoms.

"Q: Well, did you find any mental and emotional symptoms in this boy?

"A: Not as they are referred to in that Special Regulation, no sir.

"Q: *Well, not as they are referred to in a Regulation, but your opinion as an expert. Do you have an opinion?*

"A: *Yes, I do, sir.*

"Q: And your opinion is, is it not, that he was having that type difficulty?

"A: A character and behavior disorder, yes, sir.

"Q: All right. And a character and behavior disorder may or may not be due to mental illness, is that correct?

"A: A character and behavior disorder is not due to a mental illness as defined by such terms as psychosis, insanity, or mental derangement." [Italics supplied.]

## IV

Defense counsel was entirely conscious of the ambiguity in the "policeman" test as stated in TM 8–240—and brought out that Major ▮ Baker had applied it incorrectly in certain of his testimony. Yet, despite this awareness of the possibility of confusion latent in an unqualified reference to the test, he made no request for further instructions when the law officer advised the court that "If the accused would not have committed the act had there been a military or civilian policeman present, he cannot be said to have acted under an irresistible impulse." To me this want of a request for clarification seems clearly attributable to a belief that the court would not construe the policeman test to refer to anything other than the probability of detection. Under these circumstances, I cannot see how the instruction may be said to furnish a basis for reversal.

QUINN, Chief Judge (dissenting):

I would reverse the findings of guilty and order a new trial.

The pivotal question in this case is the accused's sanity. As appears from Judge Latimer's opinion, substantial expert and lay testimony supports each side of the issue. As far as the experts are concerned, several service psychiatrists were of the opinion that the accused was so far free from mental defect, disease, or derangement as to be able to distinguish right from wrong and to adhere to the right in respect to the act charged. Conversely, Dr. Manfred Guttmacher, Chief Medical Officer, Medical Service of the Supreme Bench of Baltimore, Maryland, a psychiatrist of acknowledged reputation (see Bibliography, TM 8–240, AFM 160–42, September 1950), found that the accused is a paranoid schizophrenic, and that he suffered from a "psychotic irresistible impulse" at the time of the offense. Moreover, in his report he said that the accused did not "impress the Examiner as one of those borderline psychotics but rather as a flagrant one." Dr. Guttmacher's opinion is supported by that of Loyal B. Calkins, now Criminal Psychologist for the Maryland State Penitentiary and formerly Chief Clinical Psychologist, Branch, U. S. Disciplinary Barracks, New Cumberland, Pennsylvania. Dr. Calkins conducted a psychological examination of the accused shortly after he was confined at the Disciplinary Barracks. The results of a Rorschach test administered to the accused "indicated paranoid schizophrenia." Later, he was present at an examination of the accused by a Dr. Eaton, a civilian consulting psychiatrist at the Barracks. Dr. Eaton agreed with the diagnosis of paranoid schizophrenia. Additionally, it was shown that one of the accused's brothers was in a mental institution, a second brother had received psychiatric treatment, and a sister had "several nervous breakdowns." James K. Evetts, Esquire, District Attorney of Lampasas County, Texas, who had frequently observed persons whose sanity was "seriously questioned," investigated this homicide. He talked to the accused on the day of the shooting. In his deposition testimony, admitted in evidence at the trial, he said, "In my opinion, he (the accused) knew the difference between right and wrong but I seriously doubt that he had the ability to definitely determine the nature or consequences of his actions."

If the record only showed this conflict in testimony, the case would simply be one in which the triers of fact had decided the issue upon substantial evidence; on that basis the findings of guilty would have to be affirmed. United States v. Ransom, 4 USCMA 195, 15 CMR 195. However, more than a mere conflict of testimony appears.

Apart from the instructional error found by the majority, three important questions are raised: (1) Shall we adopt as part of the military law the expanded view of mental incapacity propounded by the United States Court of Appeals for the District of Columbia in Durham v. United States, 214 F2d 862? (2) May a court-martial take judicial notice of the Department of the Army technical manual, TM 8–240, Psychiatry in Military Law? (3) If such notice may be properly taken, does the manual correctly state the law relating to irresistible impulse?

On the first point, although I am normally inclined to apply to the military the established law of the Federal civilian jurisdiction, when it is not contrary to or incompatible with express provisions of military law, I believe that no uniform Federal standard has yet been formulated. Other Courts of Appeals have not acted on the matter and no solid core of Federal precedent exists. Of course, the absence of such precedent does not require uncritical adherence to outmoded and acknowledged inadequate standards. But, while the Durham case is indeed persuasive, I think that, in so controversial an area, we should proceed with extreme care. For the time being, therefore, I think that it is better to adhere to the rule presently set out in the Manual for Courts-Martial. ·

With respect to the second question, the majority hold that a court-martial can take judicial notice of █ the contents of the technical manual. I disagree. Paragraph 147, Manual for Courts-Martial, United States, 1951, authorizes a court to take judicial notice of the organization of the Department of Defense and the departments thereunder and "the regulations and official

publications pertaining thereto or issued thereby." However, such notice is permitted only for the purpose of recognizing the existence of certain *facts*. Ibid., page 273. The technical manual, "Psychiatry in Military Law," does not purport to state existing facts; rather it seeks to define and explain medicolegal principles. Its purposes are set forth as follows:

"This manual defines and explains the legal standards applied in military law to determine whether a person was mentally responsible at the time of an offense and has the requisite mental capacity to be tried by court-martial. Since a diagnosis of a particular psychiatric disorder, viewed in the light of these legal standards, may result in a determination that the individual is or is not criminally accountable, certain psychiatric disorders are discussed with reference to their legal effect. Important aspects of psychiatric medicolegal examinations are discussed and methods, procedures, and standards prescribed therefor. Matters pertaining to psychiatric testimony before courts-martial with which the medical examiner must be acquainted are mentioned. So that he may properly perform his duties as psychiatric examiner and prospective expert witness before a court-martial, the medical officer should become thoroughly familiar with the legal concepts of mental responsibility and capacity as outlined in Chapter XXV of the Manual for Courts-Martial, 1949 (referred to herein as MCM, 1949) and this manual." [TM 8–240, AFM 160–42, Psychiatry in Military Law, September 1950, paragraph 1.]

A publication which seeks to teach, explain, or discuss the subject-matter of one discipline in relation to that of another cannot be regarded as a statement of fact. It is, at best, a textbook or treatise on such subjects.

Generally textbooks on the law are not admissible in evidence. Under certain circumstances they may undoubtedly be considered by the trial judge for the purpose of ascertaining the applicability of principles of law. Paquete

Habana, 175 US 677, 44 L ed 320, 20 S Ct 290. But, they may not be read or presented to the jury as evidence. United States v. Chaput, 2 USCMA 127, 7 CMR 3; Walker v. Johnson, 96 US 424, 24 L ed 834. To the extent, therefore, that the technical manual attempts to delineate the legal principles on irresistible impulse it cannot properly be offered to the court-martial members for their consideration. Similarly, standard medical treatises are not competent evidence of either the facts or the opinions advanced by the authorities. United States v. One Device, Etc., 160 F2d 194 (CA10th Cir 1947); Union Pac. Ry. Co. v. Yates, 79 Fed 584 (CA 8th Cir 1897); United States v. Paddock, 68 F Supp 407 (WD Mo); 20 Am Jur, Evidence § 968, pages 816–818. True, they may be used to a limited extent in connection with the testimony of an expert witness, but they have no independent probative value. Western Union Telegraph Co. v. Ammann, 296 Fed 453 (CA3d Cir 1924). In my opinion the Manual for Courts-Martial does not change these settled rules of evidence.

To construe the judicial notice provision of the Manual as a license to admit in evidence, indiscriminately, every kind of matter merely because it bears the imprimatur of the head of a service branch opens the door to administrative prejudgment of the guilt of an accused. Suppose, for example, that the Secretary of the Army published a technical manual on desertion, and in it he said that a much prolonged absence is any absence in excess of fifteen days. Are we to say that this statement establishes as a fact that the absence is "much prolonged" so that the court could then draw from it the inference of an intent to remain away permanently? See Manual for Courts-Martial, United States, 1951, paragraph 164a(3), page 313. United States v. Dean, 5 USCMA 44, 17 CMR 44. An emphatic "No" is the only answer to that supposition. The apparent purpose of the Manual's provision on judicial notice is to obviate proof of facts which, in general, are notoriously known in the military establishment. It is a perversion of that purpose to use it as

authority to take judicial notice of individual beliefs or opinions. See Gilbert v. Gulf Oil Corporation, 175 F2d 705 (CA4th Cir 1949). It was error, therefore, for the law officer to direct the court to take notice of the contents of the technical manual.

The accused did not object to the ruling of the law officer. Ordinarily, a failure to object to the admission of evidence constitutes a waiver of the right. Also, it might be argued that defense counsel was the first directly to open the door to a consideration of the technical manual. In his recross-examination of Major T. A. Hill, Neuropsychiatrist, who appeared as a rebuttal witness for the Government, the defense counsel asked whether "the rule of irresistible impulse, as far as Army psychiatry is concerned, is not governed by three principles." Major Hill's reply was, "That's what the Manual says." He was then questioned closely about these principles. However, it may justifiably be argued that the initial reference to the technical manual was made by the doctor. On cross-examination, he was asked if he believed that the accused was an "irrational person." His reply led to the following colloquy:

"Q. You would say, would you not then, that he had at least some form of mental disorder which you psychiatrist [sic] recognize, would you not?

A. Within the terms of legal mental illness, no.

"Q. Now, you don't pass upon the law in the case. Let's get that straight, Major.

A. I am here to answer three questions. One, was this man sane, by that we mean, could he adhere to the right; two, could he tell right from wrong; and three, could he participate in his own defense. I am not here to answer anything else.

"Q. You're not willing to answer anything else?

A. I don't think that it's necessary.

"Q. Oh.

A. My interpretation of the Army Regulations are that I don't have to answer anything else.

"Q. All right. Well, you don't mind answering this, do you? You

**371**

have a classification whereby there is a name for the condition which you have described as belonging to Kunak.

A. That is correct.

"Q. What is that name?

A. It is an emotional instability reaction."

No matter who opened the door to consideration of the medical aspects of the technical manual, the doctrine of waiver should not be applied to the accused's right to question the definition and explanation of the legal principles set out in it. The accused's entire case is based upon the defense of irresistible impulse. In his closing argument, the defense counsel strongly disputed the technical manual's statement of the law relating to that defense. Under these circumstances it would be a manifest miscarriage of justice to hold that he waived his right to contest the correctness of the technical manual's discussion. United States v. Fisher, 4 USCMA 152, 15 CMR 152. United States v. Ransom, supra.

Attempting to set out the law, the technical manual enumerates three criteria for the existence of an irresistible impulse. These are as follows:

". . . Before testifying that an accused did the act because of an irresistible compulsion, the medical officer should be satisfied first, that the act is part of a repeated psychoneurotic pattern; second, that the patient exhibited mounting anxiety or tension which was relieved by the theft, arson (or whatever the compulsion was); and third, that the compulsion generated by the illness was so strong that the act would have been committed even though a policeman had been at the accused's side at the time the opportunity to commit the offense presented itself." [TM 8–240, AFM 160–42, Psychiatry in Military Law, September 1950, paragraph 5a.]

On this appeal, the accused contends that the third requirement, which was also used by the law officer in his instructions on the issue, is an unreasonable and arbitrary limitation of the doctrine. In partial support of his conten-

tion, he argues that in a 1953 edition of the publication "the Army and Air Force backed away from this theory." It may also be noted that in the previous publication on the subject, no mention was made of such a requirement. War Department Technical Bulletin, TB Med 201, October 1, 1945.

Certainly the Manual for Courts-Martial does not establish any such test. And, it seems that no such requirement has been articulated in any of the American jurisdictions in which the doctrine of irresistible impulse has been accepted. See Smith v. United States, 36 F2d 548 (CA DC Cir 1929); State v. Green, 78 Utah 580, 6 Pac2d 177; Parsons v. State, 81 Ala 577, 2 So 854. Annotations in 70 ALR 659, 173 ALR 391. 22 CJS Criminal Law § 61, pages 126–128.

Apparently the "policeman present" idea was first mentioned in an English case. People v. Hubert, 119 Cal 216, 51 Pac 329, 331, comments on the reference as follows:

". . . Lord Bromwell, in a discussion of this subject, related the case in which a witness, to prove that a prisoner was so afflicted, related that he had once become violent and killed a cat, and said he believed the impulse could not be resisted by the defendant. His lordship asked if he thought he would have killed the cat if a policeman had been present. The witness answered, 'No.' His lordship then said he supposed the impulse was irresistible only in the absence of a policeman."

Plainly Lord Bromwell's supposition was not intended to establish a definitive test for the existence of an irresistible impulse. In any event, neither the English nor California law recognizes the doctrine, and it would be ironic indeed to use these cases as authority for the legal criteria for establishment of the defense.

Questionable validity also appears in the first of the technical manual's standards for determination of the existence of an irresistible impulse. Thus, in Bradley v. State, 31 Ind 492, 510, the Supreme Court of Indiana noted that to require a showing that the impulse was part of a repeated pattern "would

372

find very few cases where it could be favorably applied. Before the defense could be available, the victim of the mania would doubtless have been confined for life, or executed, in an effort to acquire the habit." However, I need not decide whether the standard prescribed by the technical manual is legally correct. At best, this publication gives only "lip service" to recognition of the doctrine of irresistible impulse as an established part of military law.

The majority hold that the technical manual is substantially a correct amplification of the Manual for Courts-Martial. I disagree. The Manual for Courts-Martial expressly makes the doctrine of irresistible impulse a part of the military law. The technical manual, however, virtually eliminates it from any possible consideration by a court-martial. In pertinent part, it says:

". . . It is evident that only very rarely, *if indeed ever*, do offenses committed within the framework of a *supposed* compulsive psychoneurosis satisfy all three criteria, particularly the third."

If this statement purports to set out the law, it severely limits the scope of the rule as prescribed in the Manual for Courts-Martial. The law officer was, therefore, bound to tell the court that it did not correctly define the law. On the other hand, if it is intended only to express an independent medical opinion on the impossibility of a true irresistible impulse, it should not have been admitted in evidence. See Northern Trust Co. v. Commissioner of Internal Rev., 116 F2d 96 (CA7th Cir 1940).

The military expert witnesses were uniformly agreed on the medical diagnosis. Under the circumstances of the case, this is indeed strange. It is almost axiomatic in the profession that "distinguished scientists of the mind . . . [testify] on both sides and in all directions with positiveness and conviction." Holloway v. United States, 148 F2d 665 (CA DC Cir 1945), cert den 334 US 852, 92 L ed 1774, 68 S Ct 1507. As was noted by Dr. Henry A. Davidson, Chairman of the Psychiatry Section of the American Academy of Forensic Sciences:

"Psychiatrists thus disagree with one another. They answer one question by asking another. This is evidence of their honesty. In this kind of expert testimony, it is agreement, not disagreement which is suspicious. If footprint expert A says that the print was 12.5 inches long, and expert B says it was 14 inches long, then one of them is dishonest. It had to be one or the other. But, if Dr. X says that this patient could not grasp the implications of his act, while Dr. Z said he certainly could, then the disagreement is no evidence of dishonesty. Indeed, if one side brings to the stand a parade of psychiatrists all of whom agree perfectly on these interpretations, then I would be suspicious of their honesty. In many areas, the psychiatrist reports opinions rather than facts. This being so, we have to destroy the model which some psychiatrists and most lawyers have erected for the expert. According to this model, the expert examines a thing or a person and ascertains a simple truth which he reveals to the court. If this were the true state of affairs, lawyers would have the right to complain when psychiatrists disagree and psychiatrists would have the right to demand immunity from cross examination." [Davidson, Psychiatrists in Administration of Criminal Justice. 45 J Crim Law, 12, 13 (1954).]

The accused contends that the unanimity of opinion of the service psychiatrists was effected by a "disciplined adherence" to the restrictive standards set by the training manual. Such coercive influence would unquestionably destroy the value of the expert's opinion. It is unnecessary here to discuss the matter exhaustively but I am constrained to make this observation: The use of the training manual as advocated by the Government obviously circumscribes the testimonial freedom of any psychiatric expert. To that extent, at least, it is an illegal and unconstitutional invasion of the judicial process. See Alton v. Alton, 207 F2d 667, 673 (CA 3d Cir 1953); judgment vacated on ground cause become moot, 347 US

610, 98 L ed 987, 74 S Ct 736. However, whether reversal is required on that basis alone, is a question I need not decide.

So, too, I need not consider the apparent misunderstanding by the military psychiatrists of their position as witnesses testifying about the mental state of the accused. From their testimony, it seems that they regarded their medical opinion of the accused's mental capacity as determinative of his legal responsibility for the offense charged. The misconception plainly appears in the quoted part of Major Hill's cross-examination. It also appears in the following portion of the cross-examination of Captain Schumacher:

"Q. So if the court should find in this case, and of course I realize that you didn't have the benefit of these findings, if the court should find in this case, from the evidence . . . that [stating certain facts] . . . would you then have an opinion satisfactory to yourself as to whether or not at the time of this shooting he was acting under an irresistible impulse?

A. No, because I don't believe that the court can determine that. I think that a psychiatrist has to determine that.

"Q. You don't believe that the court can find any facts then, do you?

A. I don't believe that the court can testify as to the mental competency of a man. I think that that takes a specialist.

"Q. You think that a psychiatrist is the only one who can do that?

A. Yes, sir."

The military witnesses were in error in this respect. The ultimate decision of whether the accused possessed sufficient mental capacity to be legally responsible for the offense charged is for the triers of fact. See Davidson, ibid, page 12–14.

In this case, I am satisfied to appraise the legal effect of the technical manual in the same way that I would appraise any other improperly admitted evidence. In the questioned publication, the highest authority in the court's branch of the service expressed an opinion which virtually deleted the doctrine of irresistible impulse from military law. With that opinion in evidence, it is very doubtful that a court would attempt to find contrary to this official pronouncement, without some instruction on its true nature as opinion, not fact. Unexplained, the training manual seriously embarrassed the accused in his defense. I would, therefore, set aside the findings of guilty and order a new trial.