UNITED STATES, Appellee

v.

WILLIAM M. GRIER, Sergeant, U. S. Army, Appellant

6 USCMA 218, 19 CMR 344

No. 6222

Decided August 5, 1955

*Captain Albert C. Malone, Jr.,* argued the cause for Appellant, Accused.

With him on the brief were *Lieutenant Colonel Edward Duvall, Lieutenant Colonel Jackson K. Judy* and *First Lieutenant Anthony R. DeSanto.*

*First Lieutenant A. Kenneth Pye* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton* and *Major Clayton B. Tasker.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

### I

The accused stands convicted on one specification of wrongful use of morphine, in violation of Article 134, Uniform Code of Military Justice, 50 USC § 728. We granted his petition for review to determine the single question of whether the law officer erred in not instructing on the knowing or conscious use of the narcotic.

The facts bringing this issue to the fore are these: On June 24, 1954, at approximately 11:30 a.m., narcotic agents of a military police detachment entered a Korean house in Pusan, Korea. They had received information that narcotics were being sold at that residence, and the entry was for the purpose of making an investigation of the complaint. It subsequently developed that the reputed dispenser of the drugs had moved from that location prior to the incident herein involved. Upon entering the house, the investigators identified themselves, and when the accused saw them he fled through a rear door. The agents pursued him for approximately one-half mile but were unsuccessful in the chase. They obtained his name from the occupants of the house, and at about 8:45 p.m. of the same day they apprehended him at his unit. He voluntarily gave a urine sample which, upon subsequent analysis, disclosed the presence of morphine in his system. A second sample was given on the following morning. It, too, was analyzed, but the presence of morphine was not detected. The testimony for the accused sought to establish a two-pronged defense, first, that he made a mistake of fact, and, second, that he lacked knowledge of the fact that he had taken any morphine internally. He testified he had not smoked any cigarettes and had taken no sort of intravenous or intramuscular injection other than the penicillin treatment hereinafter referred to. He further stated he had never used narcotics, and he could only account for the presence of the drug in his system in the following manner. He had contracted a venereal disease and on or about the 21st day of June 1954, he sought out a Korean "mama-san" to administer penicillin to relieve the condition. She gave him three shots, the first on the 21st of June and the last two on the next two successive days; and those injections might have been the source of the drug. He explained that he fled from the investigators because he was a noncommissioned officer who became frightened because he did not want to be apprehended in a house of ill fame; and he testified that he voluntarily submitted samples of his urine.

### II

Counsel for the accused assert that an instruction on mistake of fact should have been given by the law officer, but, for the reasons which follow, we conclude that the issue was not raised. The Korean woman who administered the shots was called as a witness, and she testified that she purchased the penicillin at a commercial drug store. It was furnished in a trade container showing it to be that particular medicine. She corroborated the accused's testimony that there were three shots given on successive days; however, she fixed the time of the first injection as June 10, 1954, some two weeks before this incident. She was not suspected of being involved in the sale or use of drugs, and her testimony that she had never used narcotics of any kind was not rebutted. Furthermore, she made the syringe and needle used by her available to the investigators. The instruments were taken to a chemical laboratory and examined to determine wheth-

220

er any residue of a morphine compound was present, but the tests were negative. She further asserted that after each use of the equipment, she sterilized the needle and syringe by washing them in alcohol.

In addition to the Korean woman's testimony, a medical expert testified that had the hypodermic needle and syringe been first used for injections of morphine, and then for penicillin, the amount of the former carried over into the latter would have been insufficient to have been detected by the urinalysis. Furthermore, he stated that from his experience, 82 hours from the time of injection was the longest period that he had been able to determine the presence of morphine by urinalysis, and it would not be detectable if the elapsed time was approximately two weeks. Finally, his testimony establishes that penicillin contains no morphine derivative and that the accused would have had some positive reaction from the amount of morphine present in the sample. The latter testimony becomes of importance because the accused asserted he never at any time noticed any effect from the penicillin injections save the curing of the disease.

In view of the compelling evidence which excludes the injections of penicillin as the source of the drug, we conclude that accused's theory of mistake of fact is a figment of his imagination, and it is so unsubstantial and chimerical as to be improbable and unworthy of credence. Without question, the record does not raise any reasonable possibility that morphine was intentionally or inadvertently injected into his system by the woman or that the use of contaminated equipment could account for the presence of that drug in his system. We, therefore, conclude that no instruction on the issue of mistake of fact was necessary.

### III

A much more difficult question arises out of the asserted defense of ignorance of fact. A short statement ▉▉▉▉▉ is necessary to present properly that issue. The Government proved beyond a reason-able doubt that the accused had morphine in his system. His testimony, if believed, established that he was unaware of its presence and that it entered his system by means unknown to him. There is no evidence of prior use of narcotics by the accused, and he took the witness stand and testified that he had never consciously or knowingly used any habit-forming drug. He further testified that if the penicillin shots were not the means by which the drug entered his body, he could not account for its presence on this occasion. He did not remain silent and thereby leave the court uninformed about his conscious taking of the morphine. On the contrary, he asserted affirmatively that he was ignorant of the manner in which it entered his system, and his testimony is supported in part by other portions of the record. While his story may have been disbelieved by the court-martial, it could not be discarded by the law officer as unworthy of belief.

In United States v. Lampkins, 4 USMA 31, 15 CMR 31, and in United States v. Hughes, 5 USCMA 374, 17 CMR 374, we had occasion to deal with knowledge in cases involving possession of narcotics. In those decisions we quoted from, and relied upon, the rationale of the Supreme Court of California in People v. Gory, 28 Cal2d 450, 170 P2d 433. We there discussed the distinction between knowledge of the contraband character of the object and the unlawfulness of its possession, and knowledge of the presence of the object as embraced within the concept of physical control with intent to exercise such control. In Lampkins and Hughes, supra, we were confronted with the latter type of knowledge in that in both instances the accused denied knowledge of the actual presence of any physical object. Transplanting those principles into this area, this accused adopts a modified approach which falls somewhere between the two in that he denies consciously taking morphine, but he does not assert that he had not consumed any food or liquids which might have contained that drug. Obviously, an accused must eat and drink to sustain his life and he would be conscious of ingesting solids and liquids, but he

**221**

might not know they contained contraband ingredients. To put the lack of knowledge of this accused in its proper perspective, it is necessary that his use be considered under two different sets of circumstances. By way of illustrations we can make the refinements we seek to draw more distinguishable. In one instance, an accused defends on the theory that he knew the substance he swallowed was a drug but what he did not know was that the use of that particular drug was prohibited by law. That particular lack of knowledge amounts to no more than ignorance of the law and obviously that is no defense. The second instance can be illustrated by assuming an accused honestly takes what he believes to be ordinary table food. Unknown to him, it contains a proscribed drug. Clearly, he knows that he has swallowed the food, but he is ignorant of all of its component parts. That honest ignorance is important as it would be a harsh rule of law to impose criminal sanctions on a person who in good faith ingested food, believing it to be a wholesome mixture, only to subsequently find out he had consumed a contraband ingredient. While this theory may appear to announce a mistake of fact principle, this case fails to fall in that conceptual area because this accused did not contend he took what was morphine believing it to be powdered sugar; what he asserts is that he was ignorant of having taken anything that could be isolated and identified as containing that drug. If his story is to be believed, he was ignorant of a fact, not mistaken about it. Certainly, if an accused can be exculpated because he knowingly consumed a foreign substance honestly believing it to be an article which was not forbidden by law, he ought to have a good defense if he was honestly unaware that he had taken any foreign substance. United States v. Greenwood, 6 USCMA 209, 19 CMR 335. We, therefore, conclude that when, as here, an accused has testified he honestly did not know he had ingested any drug proscribed by law, and his testimony is not inherently improbable, unworthy of belief, or rendered incredible by other facts and circumstances found in the record, he has raised an issue of ignorance of fact to be resolved by the court-martial.

IV

Accepting the record as we have outlined it above, we proceed to determine whether the instructions given by the law officer met the minimal requirements necessary to apprise the court-martial members on the issue involved. For the purposes of this discussion, we need quote only two of the instructions given by that officer. Firstly, he instructed the court that it must find "That, at the time and place alleged, the accused wrongfully used a habit forming narcotic drug as alleged." Secondly, he said, "In this case the court is advised that the use of a habit forming narcotic drug is presumed to be wrongful unless the contrary appears." The other instructions complete the charge, but they shed no light on this problem.

In the cases of United States v. Lampkins, supra; United States v. Hughes, supra; and United States v. Reese, 5 USCMA 560, 18 CMR 184, we had occasion to consider similar instructions. In those three instances, the instructions were held to be inadequate for failure to highlight specifically conscious or knowing possession of marihuana. In the latter case, we had this to say:

"We have previously held that to sustain a conviction for the wrongful possession of marihuana, it must necessarily be found that the accused was conscious of the physical presence of the drug on his person. United States v. Hughes, 5 USCMA 374, 17 CMR 374. It was our view there, just as it is our opinion here, that if the court-martial reasonably could have found that a third person placed the marihuana in the coat pocket of the accused, unbeknown to him, then he would not be guilty of the offense. In that case, we announced the principle that an instruction which goes no further than to state that the possession must be wrongful is not sufficient to cover the field of awareness or conscious knowledge. A court-martial may charge an accused with

knowledge of what is on his person, and unless that issue is brought into bold relief by a specific instruction, lack of knowledge may be regarded as unimportant. In that connection it must be noted that the law officer instructed that possession of marihuana is presumed to be wrongful unless the contrary appears, and we cannot be sure of the content read into the word 'wrongful' by the court-martial. We therefore conclude that the law officer erred in failing to give a specific instruction on the issue of knowledge."

The cited cases outline the principles adopted by us in cases involving possession of narcotics, and we see no reason to depart from them in instances when use of a habit-forming drug is charged. True it is that we have one influencing factor to consider in the latter category, namely, lack of knowledge of the use of narcotics seems less probable than ignorance of its possession. The physiological effect from the internal presence of the drug might serve to alert the user to the presence of a narcotic in his system while warning signs may not be present to warn the possessor. That difference may be a matter for the court-martial to consider when deliberating on its findings, but it does not force a holding that lack of knowledge is not an issue in use cases if it is raised reasonably by the evidence. We, therefore, conclude that the law officer's instructions were inadequate to deal with the issue raised by the evidence.

V

To complete our task, we must ascertain if the error was prejudicial to the accused. Under the theories developed at trial, the court-martial had one of three choices. It could conclude either: (1) the accused was falsifying and consciously partook of the drug; or (2) even if he did not knowingly use the narcotic, he was guilty, because once internal presence was proven guilt was established; or (3) he was innocent. The findings returned by the court eliminate the last possibility, and the first is of no consequence to this dis-

cussion. Thus, the question of real importance is whether the law officer's charge was of such a character as to permit a finding of guilt based on the second choice. If it did, the finding and sentence are infested with prejudice.

The Government asserts that by giving effect to the words "wrongfully use narcotics" used in the instruction, the court-martial would of necessity find conscious use. We disagree. In United States v. Hughes, supra, we held that the word "wrongful" did not bring the issue of conscious possession into bold relief for the reason that we could not be sure what content was put into that word by the court-martial. We there said a negligent act might be viewed by the court-martial as a wrongful act, and under the facts of that case, the accused might have carelessly failed to discover his possession of the drug. Because the fact-finders might have proceeded on that premise, we held Hughes' conviction was erroneous. Here, the accused testified to his ignorance of ingesting the morphine, and while he does not show affirmatively a probable method of how the narcotic found its way into his system, we are not prepared to say that his negative testimony is unbelievable. It is reasonably possible that ignorance of taking morphine internally can exist honestly, even though it might be considered unusual. Conceding a physiological reaction ought normally to be experienced by the user, a number of factors, not excluded by the testimony in this case, might account for the accused's failure to know the narcotic was in his body. While positive testimony as to the means by which the presence of the drug could be accounted for is missing, if the accused honestly did not know the manner in which the morphine entered his body, he could do no more than give negative testimony to that effect, and raise an issue in only that way.

Going one step further, we must consider the prejudicial effect of the law officer's instruction on the presumption of wrongfulness. There are certain instances where it is permissible to shift the burden of going forward to

**223**

the accused, and because of the instruction given, that theory became focal in this instance. ʹWe believe that the doctrine is appropriate in narcotic "use" cases, but it makes a failure to instruct on conscious or knowing use of the drug more damaging. A close comparison of the two instructions will disclose that they permit the presumption arising from use to support a finding of both wrongfulness and knowledge. Under certain circumstances that may be permissible but when, as here, an issue of knowledge is raised, the court should be told that a finding on knowledge is required. Otherwise, the court is not apprised of the fact that they may find that the presumption has been rebutted by the testimony of the accused.

Once again, we are faced with speculating as to the meaning the court members gave to the word "wrongful." If they concluded that the accused was negligent or careless in not knowing morphine had been ingested by him, they could return a finding of guilty because a negligent act is a wrongful act. Any standard dictionary defines the word as unfair, injurious, reckless, or unjust. Counsel for the Government, to escape the possibility of a misunderstanding of the word, argue that the court members had only to choose between a wrongful and an innocent use of the drug, and they would not base a finding of guilt on the latter use. The argument might have merit if the court members had been told that wrongful meant something more than failure to act as a reasonable person would act under similar circumstances. Without some limitation, the word would be interpreted in its ordinary sense, and that includes many acts committed without guilty knowledge. Therefore, the law officer prejudices an accused if he goes no further than to meet the incomplete requirements of the Manual. Those instructions fail to furnish the proper guideposts, and misunderstanding is bound to creep in when the presumption flowing from use is not limited by proper instructions on knowledge when it is placed in issue. The presumption is intended to cast the burden on an accused who has narcotics

in his system to come forward with evidence to show that his use was within any exceptions permitted by law, or that he had no knowledge of the use. Yet courts-martial are bound to extend its meaning to include guilty knowledge unless the issue is specifically marked out for separate treatment. In this instance, knowledge was placed in issue, and there is more than a fair risk that the court-martial assumed the accused was guilty because morphine was found in his body and he could not prove that he used the drug innocently by proving ——for instance——that it was present pursuant to medical prescription.

## VI

In connection with the last discussion, we have not overlooked the line of cases which hold that dispensers of narcotics or poisons are guilty of an offense, regardless of their knowledge or criminal intent. There, Congress has legislated in a field which has grave potentialities for harm and the enactment discloses a legislative intent, either express or implied, to make the vendor an absolute insurer of all he places in circulation. See United States v. Behrman, 258 US 280, 42 S Ct 303, 66 L ed 619; United States v. Balint, 258 US 250, 42 S Ct 301, 66 L ed 604. We have not relied on that principle in possession cases, and our attention has not been called to any Federal case applying that rule. In addition, we fail to see any real necessity for applying it in prosecutions for using narcotics. The reason for the rule hardly applies in use cases as the potentialities for harm to the public are much more attenuated. While the stamping out of trafficking in narcotics must receive helpful assistance from military courts, well-established principles concerning criminality should not be discarded for that purpose alone. Particularly is that true in a field where difficulties of proof are readily surmountable. We are not here concerned with cases where knowledge cannot be established by facts and circumstances obtainable by the Government; we are faced only with instructional deficiencies which fail to require a finding on that issue. By way of illustration, the facts and circum-

224

stances in this case form a base for a finding of conscious use and, in practically every use case, the same situation will exist. The errors creeping into this record arise largely from a literal application of the wording of the Manual, which is inadequate to define the narcotic offenses. It deals only with possession of habit-forming drugs and, in discussing that offense, it fails to mention the possibility of knowledge being an issue for determination. We do, however, note that in the Department of the Army Pamphlet 27–9, "Military Justice Handbook, The Law Officer," knowledge is included in possession instructions but excluded in instructions on use. We do not find a good reason for the distinction, but law officers should not be content to accept the skeleton formulas as they are not tailored to meet all issues raised by the evidence. Whether knowledge be treated as an element of either use or possession of habit-forming drugs is beside the point as it falls so close to the line that, when placed reasonably in issue by evidence, the court-martial needs instructional guidance to arrive at a proper finding. If the rule we announce appears to be strict, it can be avoided in appropriate narcotics cases with no difficulty if the law officer simply instructs the court-martial that a finding on conscious or knowing use or possession, as the case may be, is required.

The decision of the board of review is reversed. The record is returned to the Judge Advocate General of the Army for reference to a board of review. A rehearing may be ordered.

Judge BROSMAN concurs.

Chief Judge QUINN dissents.