UNITED STATES, Appellee

v.

FRED BROWN, Private E–2, U. S. Army, Appellant

6 USCMA 237, 19 CMR 363

237

No. 6421

Decided August 5, 1955

*First Lieutenant John F. Christensen* argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel Jackson K. Judy,* and *Lieutenant Colonel Edward Duvall.*

*Lieutenant Colonel Andrew D. Kane* argued the cause for Appellee, United States.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

Still another drug case confronts the Court here. Charged with having wrongfully used a narcotic, Brown, the accused, entered a plea of not guilty, but was convicted of a violation of Article 134, Uniform Code of Military Justice, 50 USC § 728. He was sentenced to be dishonorably discharged from the service, to forfeit all pay and allowances, and to be confined at hard labor for one year. The convening authority ap-

proved both the findings and the sentence, a board of review in the office of the Army's Judge Advocate General affirmed without opinion, and the accused petitioned this Court. We granted review to determine (1) whether the law officer erred in permitting the Government to present evidence of a collateral act of misconduct which occurred subsequent to the offense charged, and (2) whether the instruction that an accused's claim of ignorance of fact must be both honest and reasonable was correct.

## II

On August 9, 1954, the accused, who was suspected of the wrongful use of narcotics, was given a physical examination which revealed a number of scars on his left forearm, which might have been produced by a hypodermic needle. Thereafter, he produced voluntarily a sample of his urine. Subsequent analysis of this specimen revealed the presence of morphine.

Electing to take the stand in his own defense, the accused denied emphatically that he had used narcotics at any time, and offered as a possible explanation of the appearance of morphine in his urine the fact that he had consumed approximately one pint of Japanese wine shortly before the physical examination mentioned in the preceding paragraph. He further explained that the questionable scars found on his forearm resulted from an entanglement with barbed wire, and also from an abrasion made by his wife, who had attempted to remove a tattoo mark from that part of his body.

Over vigorous defense objection, the accused admitted under cross-examination that on August 13th he had submitted a second urine sample after having—he protested—partaken of additional wine. In spite of repeated objections by defense counsel, the Government was allowed to show that a chemical analysis of the second specimen likewise disclosed the clear presence of morphine. The court-martial was specifically instructed, however, that all evidence relating to a possible use of narcotics by the accused subsequent to August 9 could be considered only insofar as it affected his credibility as a witness.

Before the court-martial closed to deliberate on the findings, *inter alia*, the law officer instructed its members regarding the defense of mistake or ignorance of fact, as follows:

"The defense has introduced evidence to show that at the time of the alleged offense, the accused was under the mistaken belief that—or that he did not know that—any substance he was using contained a habit-forming narcotic drug. Now, with respect to this evidence, the court is advised that if the accused was laboring under such a mistake, and if his mistake was *honest and reasonable* under the circumstances, he cannot be found guilty of the wrongful use of a habit-forming narcotic drug, and the law will recognize this as a defense. *However, if the accused's mistake was not reasonable under the circumstances, that is, if it was the result of carelessness or fault on his part, it is not a defense.* The burden is upon the prosecution to establish the accused's guilt by legal and competent evidence beyond a reasonable doubt. Consequently, unless you are satisfied beyond a reasonable doubt that the accused was not honestly and reasonably under a mistaken belief or that he did not honestly know that he was using a habit-forming narcotic drug, you must acquit the accused." [Emphasis supplied.]

## III

Both Government and defense appellate counsel agree that the result of █ the second urinalysis constituted evidence reflecting a subsequent and further act of misconduct. We cannot be entirely certain that this conclusion is correct, however—this for the reason that nowhere in the record do we find substantial evidence from which we may infer that the urine specimen taken on August 13 did not contain chemically observable traces of the drug initially discovered by means of the

**239**

urinalysis performed on August 9th.[1] If we are to assume that both tests reflected the presence of one dosage of morphine only, then the evidence supplied by the second analysis is merely cumulative, and as such could not possibly have prejudiced the accused in this setting. Surely, he could not have complained if, on August 9, two urine samples had been taken, analyzed and found to contain morphine—for the plain reason that no more than one charge of the wrongful use thereof was preferred against him. Nor may he urge error if the hypothesis suggested by us above be accepted. Nevertheless, we prefer to resolve doubts in favor of the appellant, and to determine the specific question presented through beginning with the premise that the evidence tending to show the presence of morphine in the accused's body on August 13 tended to establish affirmatively an additional and specific act of misconduct.

The position of the Government may be stated simply. Since the accused took the stand and denied on direct examination that he had used narcotics on any occasion, he placed his credibility in issue—with the result that extrinsic evidence of a subsequent act of misconduct became admissible to impeach his veracity. In view of recent Federal decisions which appear to extend the scope of impeachment, we find this contention to be meritorious.

In the opinion of this Court in United States v. Haimson, 5 USCMA 208, 17 CMR 208, we foresaw the problem with which we are now confronted, and observed that extrinsic evidence of misconduct denied in sworn testimony by an accused, who sought to show his good character for truth and veracity, must be regarded as admissible within the thrust of certain modern precedents. On closer analysis of the authorities cited in Haimson, we are convinced that what we said there by way of dicta should here become the law of the case.

In Walder v. United States, 347 US 62, 98 L ed 503, 74 S Ct 354, the defendant—charged with a wrongful sale of narcotics—stated in answer to a question put to him on direct examination: "I have never sold any narcotics to anyone in my life." On cross-examination, he persisted in this denial, and when questioned respecting a heroin capsule seized from him two years earlier—albeit unlawfully—he denied that the incident had occurred. The Government was thereafter permitted to introduce evidence establishing the prior act of illegal possession—but the jury was instructed carefully that this testimony was admitted for the sole purpose of impeaching the defendant's credibility as a witness. In holding that the extrinsic evidence—although illegally obtained—was admissible for the stated purpose, the Supreme Court admonished:

". . . Of his own accord, the defendant went beyond a mere denial of complicity in the crimes of which he was charged and made the sweeping claim that he had never dealt in or possessed any narcotics. Of course, the Constitution guarantees a defendant the fullest opportunity to meet the accusation against him. He must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief. Beyond that, however, there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility." [Walder v. United States, supra, page 65.]

The situation before us is strikingly similar. On direct examination, the accused was asked whether at any time he had used narcotics—to which he replied: "No, sir, I have never used narcotics." Thereafter, under instructions cautioning the court-martial to consider the evidence for the single purpose of impeaching the accused's credibility,

[1] Opinions of experts differ regarding the length of the period during which traces of morphine may be detected through urinalysis. However, authority exists for the view that the time spread involved here is not necessarily too long for the purpose.

the Government was permitted to show that the accused had probably been guilty of wrongful use at a time other than that set out in the specification. In such a setting, we can find no valid reason—and none has been advanced—why the rationale of the Walder decision is not dispositive of the accused's claim of error here.

Of course, if the accused had been asked such a question for the first time on cross-examination and had responded in similar vein, then we are not so sure that this result would follow. See Agnello v. United States, 269 US 20, 170 L ed 145, 46 S Ct 4; but see Dowling Bros. Distilling Co. v. United States, 153 F2d 353 (CA6th Cir), cert den 328 US 848, 90 L ed 1622, 66 S Ct 1120. However, we *are* sure that, when an accused willingly gambles on his ability to convince a court-martial that his character is clinically clean, he must run the risk that heretofore hidden impurities may be brought to light by the prosecution. United States v. DeLeo, 5 USCMA 148, 17 CMR 148; see also Michelson v. United States, 335 US 469, 93 L ed 168, 69 S Ct 213. It is anomalous that an accused should be permitted to forsake his right to remain silent, to place his credibility in issue, and yet be able to testify at will without fear of contradiction.

Our conclusion is undisturbed by reason of the fact that the specific act of misconduct shown here occurred *subsequent* to the time of the offense charged. Since the accused chose to testify that he had *never* used narcotics, it is obvious that he wished to convey to the court-martial an impression of starry-eyed innocence, which would weigh heavily against the damaging evidence introduced earlier by the Government. If the members of the court had believed that he had consumed narcotics knowingly at no time during his life, and if this assertion had stood uncontested, it is an understatement to suggest that the accused's odds of obtaining acquittal would have been enhanced immeasurably.

It is also apparent that testimony of this nature would be of substantial benefit only if it were unlimited in scope.

In short, had the accused stated merely that he had not used narcotics during a *certain period* of his life, reasonable persons would doubtless infer that, by thus confining his evidence of good character to a specific time, the accused was attempting indirectly to conceal facts detrimental to his claim of trustworthiness. And so we are sure that, by his broad assertion that he had *never* used narcotics, the accused intended to comprehend that period of time elapsing between the occurrence of the alleged offense and the date of trial. Therefore he cannot now complain that the impeaching evidence should have been limited to specific misdeeds antedating August 9th. It follows that we must hold that the evidence tending to establish a wrongful use of narcotics on August 13 was admissible to impeach the credibility of the accused.

In passing, we note that the current Manual for Courts-Martial specifically authorizes the use of evidence of other misconduct "[w]hen it tends to refute a claim, express or implicit, made by the accused that his participation in the offense charged was the result of accident or mistake." Paragraph 138 (*g*) (5). It may be argued with force in the instant case that the accused's defense—although couched in terms of honest ignorance—amounts also to a contention that the presence of morphine in his body on August 9 was the result of "accident," or of a mistaken belief that the wine he consumed then was uncontaminated. Thus, the evidence of drug residue revealed in the urine specimen furnished on August 13 may be considered admissible for the purpose of negating the claim of mistake with respect to the first narcotic use. An evaluation of this position is rendered unnecessary, however, by our holding earlier herein that the evidence of subsequent misconduct was admissible for the limited purpose of impeaching the accused's credibility.

IV

Appellant's second claim of error—attacking as it does an instruction to the effect that the defense of lack of knowledge must have been both honest and

reasonable—presents a problem on all fours with that resolved by us in United States v. Greenwood, 6 USCMA 209, 19 CMR 335, decided this day. In that case we held—and clearly—that an instruction setting forth the defense of ignorance of fact in terms of reasonableness was erroneous. The objection voiced there applies with equal vigor to the instruction before us now.

After several false starts, the law officer in the case at bar informed the finders of fact eventually ▮ that they might exonerate the accused only if they found him to have been laboring under an honest *and reasonable* misapprehension. Casually included within this instructional framework was a passing remark directed toward the theory of a merely honest lack of knowledge. This, appellate Government counsel have seized on in an effort to secure affirmance. In all fairness, however—and when the instructions are read critically and as a whole—we simply must conclude that the members of the court-martial were, as a practical matter, misinformed as to the applicable law. And so we are required to hold that the law officer's language phrasing the defense of honest ignorance in terms of reasonable mistake was incorrect, and did not guide the court-martial safely.

We hesitate, however, to hold that an issue of knowledge was fairly raised by the evidence here. True it is that the accused denied with vigor that he had used narcotics at any time, and further explained that innocently he had consumed a quantity of Japanese wine shortly before producing the first urine specimen. At the same time, his story collides head-on with several factors which serve directly to contradict his claim of honest ignorance. The presence of what may have been needle scars immediately over veins in the accused's left forearm strongly suggests the prior use of hypodermic injections —and his attempt at blameless explanation is inherently weak. It will be recalled that he suggested that one of them resulted from an encounter with barbed wire, and the other was caused by his wife's fingernail as she attempted to remove a tattoo stain from his arm. Moreover, the fruits of the second urinalysis tend to destroy the accused's steadfast denial of familiarity with narcotic drugs. His efforts to refute the implications of the chemically discernible fact of morphine presence, through tracing its source to Akadama wine, were further weakened by his shifting testimony on the witness stand—from which he stated at one point that he drank intermittently all day on August 13, but later recanted and sought to limit the time span to the morning alone. Indeed, he could do little else in the light of testimony to the effect that he was in confinement during the afternoon of that day.

Although the evidence, as viewed by the author of the present opinion, hardly compels an observation that the accused's testimony is inherently improbable, a majority of this Court is convinced that it does, and that all reasonable men would join in rejecting the accused's story as incredible. Although not so sure of the conclusion in this close case as his brothers, the writer is nevertheless willing—in light of the presence and nature of the considerable evidence tending to rebut his tenders of explanation—to hold that the statements made by the accused are sufficiently unworthy of belief to justify a holding that the issue of honest ignorance of the use of morphine was not raised reasonably by the evidence.

### V

Accordingly, the decision of the board of review is affirmed.

Chief Judge QUINN and Judge LATIMER concur.