UNITED STATES, Appellee

v

DERWIEN V. GROVER, Basic Airman,
U. S. Air Force, Appellant

10 USCMA 91, 27 CMR 165

No. 11,735

Decided December 24, 1958

Major Edmund B. Sigman argued the cause for Appellant, Accused. With him on the brief were Lieutenant Colonel Sam F. Carter and Lieutenant Colonel Robert O. Rollman.

Lieutenant Colonel James R. Thorn argued the cause for Appellee, United States. With him on the brief was Lieutenant Colonel Robert W. Michels.

## Opinion of the Court

HOMER FERGUSON, Judge:

Accused was tried by general court-martial on one charge of absence without leave, in violation of Article 86, Uniform Code of Military Justice, 10 USC § 886; two specifications of wrongful

91

use of marijuana, and two specifications of wrongful possession of the same contraband, all in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. He was acquitted of the wrongful use specifications but was otherwise found guilty and sentenced to a dishonorable discharge, total forfeitures, and confinement at hard labor for two years. The convening authority approved the sentence, and the board of review, after reducing the period of confinement to one year, affirmed.

Accused's petition for review was granted to determine whether the law officer erred in giving the two following instructions:

(1) "Good motives are not a defense to a crime. If you find that the evidence in the instant case supports beyond a reasonable doubt the conclusion that the accused intended to do the acts charged, to possess and to use marihuana, the accused's motives are immaterial, except, of course, as they relate to the determination of an appropriate sentence.

"In the offense here, too, it is not required—do not require a specific intent. A knowledge of the character of the object and of the unlawfulness of the possession thereof refers to no more than the defense of ignorance of the law. This type of knowledge is immaterial in either the use or possession situation."

(2) ". . . [I]f, at the time a military personnel is apprehended by civilian authorities, he is in an unauthorized absence status, in other words, absent without proper authority, that status remains until he returns to Government control, whether he is convicted or acquitted."

Consideration of the issue involving the first instruction necessitates a rather detailed recitation of the facts. In late September of 1957, an Airman Wallen, who was stationed with the accused at Chanute Air Force Base, informed the accused that marijuana was growing wild on the base property. The accused later expressed interest in this discovery and informed Wallen that he wanted him to meet a friend who used

marijuana and would pay for a quantity of it. Shortly thereafter, accused introduced Wallen to one Robbins. During Friday evening of October 4, 1957, Wallen, Robbins, the accused, and two girls left a local tavern and proceeded to the home of one of the girls in Champaign, Illinois. At this time, a small quantity of raw marijuana was produced—apparently by Wallen whom the accused thought had acquired it on the base earlier that evening. After "curing" the raw material in an oven, some members of the quintet rolled cigarettes and smoked them. Accused admitted handling the marijuana on this occasion but stated, contrary to the testimony of Wallen and one of the girls, that he only pretended to smoke the material but did not actually do so. Either on that occasion or early the next morning, plans were laid for the procurement of larger quantities of the raw weed from its source on the base and for its eventual sale in Chicago. In furtherance of this enterprise, Robbins and Wallen journeyed to the Air Base and secured a substantial quantity of the narcotic in its raw form. The accused declined to accompany them, allegedly because he was absent without leave at the time and feared apprehension if he ventured within the confines of the base. On their return, the accused joined Robbins and Wallen, and the three went to the apartment of the second girl, where the accused assisted in cleaning and curing the marijuana. There was testimony, denied by the accused, that the drug was smoked by him on that occasion. Shortly thereafter, during the early afternoon of October 5, 1957, accused separated a quantity of the marijuana and left the apartment carrying it with him. He explained that he wanted to show it to friends in a nearby city who were interested in the product. Robbins and Wallen then left for Chicago, where they spent the remainder of the week-end trying unsuccessfully to dispose of their contraband. The accused, contrary to his expressed intention, stayed in Champaign. That same afternoon he met a lady friend in a moving picture house and "blurted" out that he had possession of a sack of marijuana. That evening,

fearing he might be apprehended with marijuana in his possession, the accused threw away the quantity acquired earlier in the day.

On Monday morning, October 7, 1957, accused telephoned the Base Office of Special Investigations and informed the agent with whom he spoke that Wallen and Robbins had procured marijuana on the base and had transported it elsewhere for curing. Two days later, accused made a statement to an investigating agent relating some of the facts set forth herein. At that time, he also turned over to the agent two marijuana cigarettes he had obtained the night before from Robbins. When questioned as to his purpose in providing the information, the accused stated in effect that he had not been personally concerned when Wallen and Robbins merely smoked marijuana, but "considered it . . . [his] business" when the peddling was started—that he had "seen the effects it has on high school kids." This, he alleged, was his purpose or reason for making the disclosures.

At trial, accused testified his reason for introducing Wallen to Robbins and for ultimately contacting the Office of Special Investigations, was a hope that by so doing he could gain information concerning marijuana traffic in the area. Allegedly, he hoped to give the information he acquired to Federal agents and thereby gain the good favor of his commanding officer who, according to the accused, was considering him for an undesirable discharge because of several prior instances of misconduct.

### The first issue.

In disposing of the first granted issue, we need not consider the propriety of the instruction bearing on █ motive because a reading of the record convinces us accused's testimony fails to raise an issue that the possession involved in the offenses of which he was convicted was in good faith and for the purpose of assisting the Government in apprehending violators. While we will not attempt a minute dissection of the record, certain of the accused's statements adequately support our conclusion. The accused's testimony, even if believed, fails to raise an issue that his possession of the marijuana was innocent. His testimony shows a vacillation in his intent. He states that when he took the package of marijuana to the theater on October 5th, "I didn't know exactly what I was going to do," i.e., in the way of contacting the authorities, and went to a movie to think it over. He testified that a girl with whom he was acquainted was at the movie and "she asked me if I thought it was the right thing to do, to turn informer." He then goes on to testify as to throwing away the package of marijuana and recites additional activities of Saturday, October 5th. His testimony continues: "Then Sunday I was on the base all day. Monday morning I called the OSI. I made up my mind right away." Other testimony of the accused shows his hesitation in reporting the activities of his acquaintances to the authorities. For example, the accused was asked the question on cross-examination:

"Why didn't you call up the OSI right away? Why did you wait 'til Monday?"

He replied in part:

". . . It's not easy to turn in someone you know. That is why I didn't go directly to the OSI right then. I wanted to think it over, . . ."

The accused, earlier in the trial, had admitted possession of marijuana at the times and places alleged in the specifications and his additional testimony, even if believed, shows that any innocent possession refers only to the two cigarettes actually turned over to the authorities and not to the possessions of which he was convicted. From his own testimony, he did not definitely make up his mind to contact the authorities at least until after he had gone to the theater with the package of marijuana on October 5th. The offenses of wrongful possession of marijuana of which he stands convicted both occurred prior to the time that, from his own testimony, he had an innocent possession. We are unable to say, therefore, that any defense of innocent possession was raised by the evidence as to the of-

fenses for which he stands convicted. Therefore no instruction in that regard was required and the validity of the instruction given need not be considered.

### The second issue.

We now consider the second and final issue. On October 15, 1957, slightly less than a week after ▇▇▇▇▇▇▇■ making his statement to the Office of Special Investigations, accused absented himself without leave. His freedom was short-lived, however, for two and one-half hours later he was confined by civil authorities pending trial for illegal possession of narcotics. At trial, he was acquitted and subsequently returned to military control on November 14, 1957.

Whether an accused would be criminally responsible for the entire period of an absence which at its inception is unauthorized, but where he attempts to terminate his absent without leave status and is prevented from doing so by virtue of his confinement, trial, and acquittal by civil authorities, need not concern us here. There is nothing in the evidence in the instant case to indicate the accused made any effort to terminate his absent without leave status. There is nothing to indicate that the continuation of the absence was other than by his own "misconduct," see United States v Myhre, 9 USCMA 32. 25 CMR 294, and he is responsible for the entire period of unauthorized absence charged and proved. We, therefore, find no prejudice to the accused from the use of the quoted instruction under the facts of this case.

For the reasons stated, the decision of the board of review is affirmed.

Chief Judge QUINN concurs.

LATIMER, Judge (concurring in the result):

I concur in the result.

With respect to the second issue, I agree generally with my associates. However, as to the first ▇▇▇▇▇▇■ granted assignment, I have some difficulty in ascertaining the Court's basis for holding that the issue of innocent possession was not raised. In their opinion, my colleagues state that even if the testimony of accused is believed, the instruction is not required by the evidence. The difficulty with this position is that it fails to take into account the accused's positive assertions he voluntarily became involved with his associates solely to secure evidence to turn over to Federal authorities. I merely suggest that if that statement is believed, an issue is raised, for we have held that the testimony of an accused alone may raise an issue unless it is inherently improbable or unworthy of belief. United States v Wallace, 2 USCMA 595, 10 CMR 93; United States v Apple, 2 USCMA 592, 10 CMR 90. My reason for holding the questioned instruction was not required is that I find accused's claim, that his sole purpose in possessing marihuana was to assist authorities, falls within that exception. United States v Sturmowski, 10 USCMA 86, 27 CMR 160; United States v Mardis, 6 USCMA 624, 20 CMR 340; United States v Brown, 6 USCMA 237, 19 CMR 363.