UNITED STATES, Appellee

v

DANA M. WEST, Airman First Class,
U. S. Air Force, Appellant

15 USCMA 3, 34 CMR 449

3

No. 17,518

August 21, 1964

*Major Milton E. Kosa* argued the cause for Appellant, Accused. With him on the brief were *Colonel Daniel E. Henderson, Jr.,* and *Lieutenant Colonel James W. Logan.*

*Major Neil Kasdan* argued the cause for Appellee, United States. With him on the brief was *Colonel Emanuel Lewis.*

## Opinion of the Court

FERGUSON, Judge:

Arraigned and tried before a general court-martial convened at Stead Air Force Base, Nevada, by the Commanding General, 3535th Navigator Training Wing (ATC), the accused was found not guilty of one specification of wrongful possession of narcotic drugs but convicted of another count alleging the same offense, both in violation of Uniform Code of Military Justice, Article 134, 10 USC § 934. He was sentenced to bad-conduct discharge, forfeiture of $60.00 per month for six months, confinement at hard labor for one year, and reduction. Intermediate appellate authorities affirmed, and we granted accused's petition for review upon his contention that the law officer erred prejudicially in refusing to submit to the court-martial a purported defense of lack of wrongfulness in his admitted possession of the drugs involved.

On March 15, 1963, an Airman Navarro found a small leather bag in front of the barracks in which he and the accused resided. The bag contained eight vials, each bearing pharmacy labels from the local Air Force dispensary properly indicating their contents. Navarro turned the bag and its contents over to a Dr. Green, who in turn delivered it to the Hospital Commander, Dr. Bechert. Dr. Bechert passed the bag to Agent Stewart of the Office of Special Investigations, with the information that the accused, an Air Force pharmacy specialist, "had claimed ownership to the case." Chemical analysis indicated the contents of the bottles in the case variously contained, as indicated on their labels, opium and glycyrrhiza tablets, codeine sulfate tablets, merperidine hydrochloride (demerol) tablets, amytal sodium capsules, bonamine tablets, nembutal capsules, seconal capsules, and phenobarbital tablets.

Stewart interviewed Airman West after properly advising him of his rights under Code, supra, Article 31, 10 USC § 831. West acknowledged ownership of the case, and stated "this was a case that he had maintained for overages on controlled drugs while working in the pharmacy." He went on to declare that "periodically he would count the controlled drugs in the pharmacy and at the time he would find an overage, maybe one, two, three pills, he would insert these into the correct bottle that he was maintaining in the leather case." The case and its contents were maintained in the pharmacy safe. Pharmacy records indicated that opium and glycyrrhiza tablets had not been stocked in the pharmacy since September 29, 1962. Present stocks of this drug were located "on the ward."

Control procedures for narcotics in

Air Force dispensaries provide for strict accountability. An issue of tablets to the pharmacy was recorded on a narcotics control log. Each time a drug was prescribed, its name, that of the prescribing physician, the number of tablets included in the prescription, and the balance remaining were recorded. There was a monthly audit by a disinterested officer to determine if there were overages or shortages in the narcotics supply. If an error in accounting was discovered, "it would be rechecked by a disinterested officer and his audit would correct your card for that month." According to Lieutenant Lakey, the present Pharmacy Officer, "maintaining a narcotics overage bag in a USAF pharmacy . . . is prohibited," for "it's illegal for anybody to have narcotics in your possession unless you have a written prescription for it, sir."

The ordinary stock of narcotics was maintained in bottles in the pharmacy safe. The safe was to be locked even during duty hours, and the drugs were to be removed therefrom solely for the purpose of filling a prescription. This information had been imparted to the "new" pharmacists on duty in the dispensary.

Technical Sergeant Robinson, formerly Noncommissioned Officer in Charge of the Pharmacy, testified that he had seen the case in question on the counter in the pharmacy, but had never seen it in the safe. Overages occurred and were discovered during normal monthly audits. However, the tablets were retained in their normal container, and he had no knowledge of the maintenance of any overage bag. He declared he had been in charge of the pharmacy from January 10, 1963, until June 14, 1963.

Judicial notice was taken by the court-martial of various Air Force directives providing for the strict control of narcotic drugs and requiring they be securely locked in a safe or similar container.

The accused elected to appear as a witness in his own behalf. He testified that he arrived at Stead Air Force Base on July 20, 1960, and occupied the position of pharmacy specialist in the dispensary for approximately three years. He identified the leather case in question as containing vials of narcotics which were "overages that we had in the pharmacy in case that during a narcotics count we came up short of narcotics and we could enter these into the regular stock." The case was normally retained in the pharmacy safe. However, on March 15, 1963, he had secured the safe without placing the case in it. Having difficulty in reopening it, he placed the case in the pocket of his jacket, "and carried it down to the barracks, with the intention of returning it Monday morning."

West had not taken the bag home with him on any other occasion, and indicated it must have dropped from his pocket as he entered the barracks. On March 16, he talked to Airman Navarro about the pouch which he had found, and discovered it had been turned in. He decided to wait until March 19 and report the matter to his officer in charge, Dr. Green. In the meantime, however, he was taken into custody and interviewed by Agent Stewart.

Accused further declared that Sergeant Robinson was lying "when he said he knew nothing about . . . maintaining an overage bag." In fact, there "was a policy in the pharmacy of keeping overages." Accused was informed of this by "an enlisted pharmacist when I got here" and told Sergeant Robinson of the matter when he became Noncommissioned Officer in Charge. He concluded he should take the drugs home on the date in question in order to safeguard them when he had difficulty opening the safe. He did so rather "than leave them out." The drugs came from the filling of prescriptions for doctors' bags which were not subsequently picked up, whereas shortages or overages might arise from miscounting in the filling of various prescriptions. Although the pharmacy no longer carried opium and glycyrrhiza tablets in stock, he had maintained a vial of them on hand simply because he had not gotten

around to having them destroyed by the narcotics control officer.

At the conclusion of the case for both sides, defense counsel unsuccessfully sought an instruction on mistake of fact, based upon accused's asserted belief that he thought it right and proper to take the narcotics to his room for the purpose of safeguarding them and that maintenance of the overage bag was pursuant to the pharmacy's policy. Thereafter, he asked the law officer to define the element of wrongfulness involved in the offense charged as importing criminal action or criminality on the part of Airman West in removing the narcotics from the dispensary. On the basis that wrongful possession of narcotics "imports possession which is not authorized, period," the defense request was denied. The law officer, in fact, gave the following instruction:

"The court is advised with reference to both Specifications of the Charge that the possession by the accused must be knowing, conscious and exclusive. Such possession of a habit forming narcotic drug may be found to be wrongful unless the contrary appears. A person's possession of a drug is not wrongful when the drug has been duly prescribed for him by a physician and the prescription has not been obtained by fraud, or when he possesses it in the performance of his duty."

The theory of the Government at the trial, as argued to the members of the court-martial, was that accused's possession of the overage bag, even if maintained for the purpose which he stated and taken out of the pharmacy as he testified, constituted the offense of wrongful possession of narcotics, as it was intended to defeat Air Force regulatory measures instituted for the control of such drugs. The same theory seems to be embodied in the post-trial review of the staff judge advocate. Indeed, the board of review apparently equates accused's testimony concerning such violations to the offense of wrongful possession of narcotics. We disagree and, assuming the credibility of accused's testimony, hold that a pharmacist who, with the knowledge and under the supervision of his superiors, maintains a supply of narcotics under the circumstances alleged to be true here and takes such drugs to his barracks for the sole purpose of insuring their security has not committed the offense charged, although he may be guilty of violations of Code, supra, Article 92, 10 USC § 892.

It is to be conceded, at the outset, that narcotic drugs constitute contraband, and their very nature requires the imposition of the strictest controls. United States v Hughes, 5 USCMA 374, 17 CMR 374; United States v Lampkins, 4 USCMA 31, 15 CMR 31. But there are, of course, circumstances, under which possession of narcotics is not unlawful, although the contrary is presumed, in the absence of any explanation. United States v Greenwood, 6 USCMA 209, 19 CMR 335; Nigro v United States, 4 F2d 781 (CA8th Cir) (1925); 21 USC § 174. Thus, in *Greenwood*, supra, the late Judge Brosman sagely observed, at page 213:

". . . One who possesses a drug pursuant to a valid prescription, or who obtains a narcotic in the performance of duty, is of course relieved of criminal responsibility, regardless of the existence of knowledge of any sort. But if possession is to be deemed innocent when the result of accident or mistake—as the Manual undeniably says it is— then an issue of knowledge most certainly enters the picture. . . . [T]he foregoing reasoning leads inevitably to the conclusion that the element of scienter is not eliminated from the crime of wrongful possession of a narcotic drug simply because it received no explicit mention in the . . . section relating to the offense."

In United States v Grover, 10 USCMA 91, 27 CMR 165, we pointed out that an accused's possession of a

drug—in that instance, marihuana—might be innocent and constitute a defense to a charge of violating Code, supra, Article 134, as, for example, when he had it in his control for the purpose of turning it over to military police authorities. And we declared in United States v Grier, 6 USCMA 218, 19 CMR 344, at page 224:

"In connection with the last discussion, we have not overlooked the line of cases which hold that dispensers of narcotics or poisons are guilty of an offense, regardless of their knowledge or criminal intent. There, Congress has legislated in a field which has grave potentialities for harm and the enactment discloses a legislative intent, either express or implied, to make the vendor an absolute insurer of all he places in circulation. See United States v Behrman, 258 US 280, 42 S Ct 303, 66 L ed 619; United States v Balint, 258 US 250, 42 S Ct 301, 66 L ed 604. We have not relied on that principle in possession cases, and our attention has not been called to any Federal case applying that rule. In addition, we fail to see any real necessity for applying it in prosecutions for using narcotics. The reason for the rule hardly applies in use cases as the potentialities for harm to the public are much more attenuated. While the stamping out of trafficking in narcotics must receive helpful assistance from military courts, well-established principles concerning criminality should not be discarded for that purpose alone."

The concept involved here is simply another aspect of the doctrine of *mens rea*, as applied to the offense of wrongful possession of narcotics, *i.e.*, the wrongfulness involved. See United States v Hayes, 8 USCMA 627, 25 CMR 131; United States v Grover, supra; Morissette v United States, 342 US 246, 96 L ed 288, 72 S Ct 240 (1952). Possession is, of course, presumed to be wrongful in the absence of an explanation thereof satisfactory to the court members. United States v Holloway, 10 USCMA 595, 28 CMR 161; 21 USC § 174, supra. But the "presumption rests on a factual presumption that one who has unstamped drugs in his possession has them for an unlawful purpose." Jackson v United States, 250 F2d 772, 773 (CA DC Cir) (1957). And if the explanation is believed by the jury and shows a *lawful* possession of the drugs, the accused is entitled to be acquitted. United States v Feinberg, 123 F2d 425 (CA7th Cir) (1941). Violation of applicable Air Force regulations relating to the safeguarding of narcotics and their inventory simply does not establish the offense charged. Cf. United States v Sluss, 14 USCMA 388, 34 CMR 168; United States v Huggins, 12 USCMA 686, 31 CMR 272. If the accused's testimony, as set forth above, was accorded credibility by the fact finders, it would show a singular lack of wrongfulness of the kind contemplated by the offense in his possession of the narcotics involved. Cf. United States v Singletary, 14 USCMA 146, 33 CMR 358. As was stated in Masters v United States, 42 App DC 350 (1914), at page 356:

". . . [W]here the lawmakers have incorporated into the act a word or words descriptive of the crime which imply the necessity of 'a mind at fault before there can be a crime,' criminal intent becomes an essential fact in establishing the guilt of a person accused of its violation. The crime here does not consist in mere conversion, but in wrongful conversion. The word 'wrongful' in its legal signification must be defined from a criminal standpoint, since it is here used in a penal statute to define a crime. That the word has a well-defined meaning when used in criminal statutes is supported by Webster, who defines it as doing a thing 'in a wrong manner; unjustly; in a manner contrary to moral lay [sic] or justice.' The word 'wrongful,' like the words 'wilful,' 'malicious,' 'fraudulent,' etc., when used in criminal statutes, implies a perverted evil mind in the doer of the act. The word 'wrongful' implies the opposite of right,

**7**

a perverted evil mind in the doer of the act."

It was error, therefore, for the law officer to refuse the defense request that she further enlighten ▮▮▮ the court-martial concerning the elements of the offense charged and embody the defense theory of the case in her instructions. United States v Acfalle, 12 USCMA 465, 31 CMR 51; United States v Smith, 13 USCMA 471, 33 CMR 3. Inasmuch as the accused's testimony reasonably placed the question of innocent possession in issue, the error was prejudicial. United States v Grover, supra. We reiterate our concern with the continuing reliance of law officers almost solely upon form books for the preparation of instructions, with little or no attention to the evidence before them. Counsel, too, cannot escape merited criticism, for each advocate ought to prepare and submit instructions embodying his evidentiary and legal contentions to the law officer to the end that the fact finders will be aided in reaching a just conclusion on the matters presented. As Judge Kilday so succinctly declared for the Court in United States v Smith, supra, at page 474:

". . . What is contemplated is the affirmative submission of the respective theories, both of the Government and of the accused on trial, to the triers of fact, with lucid guideposts, to the end that they may knowledgeably apply the law to the facts as they find them. A liberal application of this approach will avoid the possible pitfalls that may attend instructing on barren and abstract legal principles in a vacuum. In any case, it surely benefits both parties to a proceeding, and obviously enhances the quest for truth and justice in a truly enlightened atmosphere."

We commend these ably expressed concepts not only to law officers but to counsel for both sides in the preparation of requested instructions for the guidance of the court members.

The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Air Force. A rehearing may be ordered.

Chief Judge QUINN and Judge KILDAY concur.